**FEDERAL ELECTION COMMISSION, Plaintiff,**

v.

**GUS SAVAGE FOR CONGRESS '82 COMMITTEE and Thomas J. Savage, Treasurer, Defendants.**

No. 84 C 1076.

United States District Court, N.D. Illinois, E.D.

April 12, 1985.

Robert E. Pease, Federal Election Com'n, Richard B. Bader, Charles N. Steele, Washington, D.C., for plaintiff.

Robert C. Howard, Robert M. Weissbourd, Hartunian, Futterman & Howard, Chicago, Ill., for defendants.

## MEMORANDUM

LEIGHTON, District Judge.

This is a Rule on defendants Gus Savage for Congress '82 Committee ("Committee") and Thomas J. Savage, as Treasurer, to show cause why they should not be held in civil and criminal contempt for violating an order of this court. On June 8, 1984, a default judgment was entered against defendants, directing them to file all outstanding reports required by the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. § 431 et seq. (the "Act"), and

1. The Act defines "person" as including "an individual, partnership, committee, association, corporation, labor organization or any other organization or group of persons but such term does

to pay a civil penalty of $5,000. When defendants failed to comply with the order, plaintiff Federal Election Commission ("FEC") moved for the Rule; it relied on the enforcement section of the Act, which provides in pertinent part:

> If the Commission determines after an investigation that any person [1] has violated an order of the court ... it may petition the court for an order to hold such person in civil contempt, but if it believes the violation to be knowing and willful it may petition the court for an order to hold such person in criminal contempt.

2 U.S.C. § 437g(a)(11).

The Rule was issued on September 12, 1984; defendants were not present, but on September 21, they appeared and responded. Plaintiff was directed to file a traverse to defendants' response, focusing on legal and factual issues before the court. Both parties were allowed to submit legal memoranda addressing issues thus presented, including whether the sanction of contempt should be imposed.

An additional hearing was held on October 19, 1984. Mr. Savage informed the court that defendants were in full compliance with the default judgment order; thus, under the circumstances, they believed further sanctions were unnecessary. The FEC did not dispute this but argued that the delay in compliance had caused substantial harm and warranted a finding of contempt. The court was told that there was no decided case under the contempt provisions of the Act, and that this was the first time the FEC had sought such a sanction for recordkeeping violations of the federal election laws.

Evidence has been presented, arguments having been made, oral and written presentations have been submitted to the court; the only issue to be resolved is whether defendants' conduct merits a finding of

not include the Federal Government or any authority of the Federal Government." 2 U.S.C. § 431(11).

contempt in this case. That issue arises out of the following facts.

## I

U.S. Rep. Gus Savage (D., Chicago) is a member of the United States House of Representatives from the Second Congressional District in Illinois.[2] In 1982, after becoming a candidate for that office, he designated a political committee to serve as his principal campaign committee, the Gus Savage for Congress '82 Committee, as required by the Act, 2 U.S.C. § 432(e)(1). The Act also requires that every political committee shall have a treasurer. 2 U.S.C. § 432(a). Political committees and treasurers are liable for reporting requirements under the Act. 2 U.S.C. § 434. Gus Savage's son, Thomas J. Savage, was asked to serve as treasurer of his father's committee. Thomas J. Savage is neither lawyer nor accountant. By his own account, he had little familiarity with the pertinent accounting principles and practices, or with the complex reporting provisions of the Act; he had no legal expertise, and had a poor understanding of what his obligations as treasurer of a major political campaign committee would entail. Nonetheless, he consented to act in that capacity for his father.

After the 1982 election, it came to the attention of the FEC that certain irregularities existed with regard to the Committee's and treasurer Savage's responsibilities under the Act.[3] The agency therefore began an investigation of the matter. Under provisions of the statute, the FEC must follow certain steps when it instigates an investigative procedure. These include:

1. a determination that it has reason to believe a violation has occurred or is about to occur, and the provision of notice and an opportunity to comment to the respondent, 2 U.S.C. § 437g(a)(2);

2. an investigation of the allegations by the FEC, *id.;*

3. a determination that there is probable cause to believe that a violation has occurred or is about to occur after receiving a brief from the general counsel and a response from the alleged violator, 2 U.S.C. § 437g(a)(3); and

4. an attempt for at least 30 days to correct or prevent the alleged violations by informal means of conference, conciliation, and persuasion, 2 U.S.C. 437g(a)(4)(A)(i).

Only after the FEC exhausts these steps and affirmatively votes, by at least 4 of its members, may it institute a civil action for relief, including an application to a federal court for a permanent or temporary injunction, restraining or any other appropriate order. 2 U.S.C. § 437g(a)(6)(A). *See Federal Election Commission v. National Rifle Association of America,* 553 F.Supp. 1331, 1332–33 (D.D.C.1983).

The FEC appears to have followed required procedure before instituting suit in this case. On April 21, 1983, it opened a Matter Under Review (MUR) against the Committee and its treasurer. (MUR is the FEC designation for a Commission investigation of possible violations under the Act.) On June 14, 1983, it found "reason to believe" that defendants had violated the Act by not filing the July '82 Quarterly Report, the October '82 Quarterly Report, the 12 Day Pre-General Election Report, the 30 Day Post-General Election Report, and the 1982 Year End Report, as required by 2 U.S.C. § 434. Defendants were notified by mail of the FEC's findings.

On October 18, 1983, after the FEC had received no response from the Committee or its treasurer, it found "probable cause" to believe that defendants had violated 2 U.S.C. § 434(a)(2) by failing to file the re-

---

**2.** Rep. Savage was first elected to the House in 1982; he was re-elected on November 6, 1984 by a wide margin. The present action is inapplicable to his 1984 campaign, for which Thomas J. Savage did not serve as treasurer.

**3.** Defendants evidently had complied with the Act's recordkeeping provisions until July, 1982; it was their failure to file reports after that date which became the subject of the FEC's investigation.

quired reports.[4] This finding was mailed to defendants, as was the FEC's proposed conciliation agreement. That agreement, dated October 21, 1983, and addressed to Thomas J. Savage, proposed a settlement of the matter if Savage would agree to file the reports in question, and to pay a civil penalty of $2,500.

After 30 days when this "informal attempt" at conciliation failed to elicit a response, the FEC, on February 2, 1984, instituted civil suit against defendants, pursuant to 2 U.S.C. § 437g(a)(6)(A). The suit sought injunctive relief and a declaratory judgment to the effect that the Committee and Thomas J. Savage, as Treasurer, had violated the recordkeeping provisions of the Act. Defendants were served with a summons and complaint on March 28, 1984, and April 3, 1984.[5]

On March 9, 1984 (subsequent to the filing of the complaint, but prior to service), defendants filed a Termination Report with the FEC, itemizing lists of receipts, disbursements, loans, and other obligations for the period from July, 1981, through March, 1983. The 30-page report, filled out in longhand and signed by Thomas J. Savage, included eight pages of itemized receipts detailing over 90 contributions from persons other than political committees; six pages of itemized receipts from other political committees; one page of itemized receipts from political party committees; a page of itemized receipts detailing loans made or guaranteed by the candidate; and nine pages of itemized disbursements representing operating expenditures for the period 1981–83. Subsequent correspondence from the FEC identified inaccuracies in this Report, and directed defendants to file an amendment to the Report correcting these problems.[6]

In the meantime, defendants failed to file a timely answer to the complaint; and on May 15, 1984, the FEC moved for a default judgment. The motion was heard by the court on May 25, 1984; defendant Thomas J. Savage, unrepresented by counsel, appeared on behalf of himself and the Committee. Mr. Savage explained that the reason he had not answered was his having filed the Termination Report which he believed satisfied his and the Committee's obligations under the Act. This court explained to Mr. Savage that, without regard to what he had filed with the FEC, he had a legal obligation to file an answer to the complaint. The court then asked Mr. Savage if he understood, and he stated that he did. The hearing was continued until June 8, 1984, to provide defendants with an additional 10 days to answer the complaint.

While the court had sought to explain to Mr. Savage that the filing of reports with the FEC in no way satisfied defendants' obligations to file an answer in this lawsuit, it soon became clear that those words had fallen on deaf ears. On May 28, 1984, during the 10 day period in which they were to answer the FEC's complaint, defendants instead presented the FEC with their 16 page Amended Report of Receipts and Disbursements of the Committee. The report responded to deficiencies cited by the FEC in the original report, and included an itemized list of receipts and disbursements covering the Committee's activities for the period July, 1981, through December, 1981.[7]

---

4. This includes previously identified reports plus the 1983 Mid-Year Report.

5. An earlier summons and complaint was sent to the wrong address and had to be re-sent to defendants at their correct addresses.

6. It appears that the FEC could have accepted the submission as evidencing Thomas J. Savage's "best efforts" at compliance, and dropped its lawsuit at this point. *See* 2 U.S.C. § 432(i) which provides, in pertinent part:
   When the treasurer of a political committee shows that best efforts have been used to obtain, maintain, and submit the information required by this Act for the political committee, any report or any records of such committee shall be considered in compliance with this Act . . .

7. Although there is no record of defendants receiving a formal response from the FEC as to this submission, the court has been apprised that "defendants filed an inadequate, amended report with the Commission." (FEC Reply to Defendants' Response to the Rule to Show Cause, # 4.)

No answer to the complaint in this court was filed, however. Accordingly, when the FEC renewed its motion for default judgment on June 8, 1984, the court granted it, ordering defendants to file, within 30 days, the required reports, and to pay a civil penalty of $5,000. Defendant Thomas J. Savage was not present on that date. At the expiration of the 30 days, when neither reports had been filed, nor fine paid, the FEC informed defendants that in the absence of immediate compliance, it would seek criminal and civil sanctions against them in this court. When the FEC received no reply to this communication, it moved for the Rule to Show Cause why defendants should not be held in civil and criminal contempt, pursuant to Fed.R. Civ.P. 70 and 2 U.S.C. § 437g(a)(11), for violating an order of this court. On September 12, 1984, the court granted the motion, ordering defendants to appear on September 21 and respond to the Rule.

When he appeared before the court, defendant Savage apologized; he said that when the Rule issued, he became "paralyzed," and recognized for the first time, that he was "in over his head." He sought the representation of counsel who informed him that the reports he submitted to the FEC were inadequate; that his failure to respond to the court's order was inexcusable; and that he must immediately comply with the court's order. Toward that end, Mr. Savage obtained the services of a professional accountant, recommended by counsel, familiar with the preparation of reports required under the Act, to ensure that complete and accurate accounts would be filed. The court was informed that the Committee was approximately $12,000 in debt, and therefore, the responsibility of paying the penalty would fall to its treasurer, Thomas J. Savage. While Mr. Savage frankly admitted he had no substantial assets and only a modest salary, he intended to pay the fine imposed by the default judgment order. He tendered a check for $1,500 as proof of his good faith in this

regard, stating that was all the money he had, and proposed a schedule for full satisfaction of the penalty through deductions from his earnings.[8]

On October 19, 1984, the parties came before the court for a final time. It was stated on behalf of defendants that all required reports had been filed, and the FEC stated that these submissions were substantially in compliance with the Act's requirements. Further, the FEC attested that it had examined the reports and found no evidence of underlying campaign finance improprieties or previously hidden misconduct. Defendants contended then, and in later written submissions, that their actions since responding to the Rule placed them in compliance with the court's order, and that no purpose would be served by the imposition of further sanctions. The FEC argued, and has since insisted, that a contempt adjudication was appropriate because harm had been caused by the delay in compliance.

## II

The Federal Election Campaign Act of 1971 is an intricate statutory scheme adopted by Congress to regulate federal election campaigns through restrictions on political contributions and expenditures. *Buckley v. Valeo*, 424 U.S. 1, 13–14, 96 S.Ct. 612, 631–632, 46 L.Ed.2d 659 (1976). At the heart of the Act are its disclosure provisions which impose reporting obligations on political committees and treasurers. Important government interests are sought to be vindicated by these disclosure requirements.

First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office ...

Second, disclosure requirements deter actual corruption by exposing large con-

---

**8.** Supplemental monthly payments of $200 for the months of October, November, December, 1984, and January, February, and March, 1985

have been made. As of this date, therefore, defendant Savage is current in his financial obligation.

tributions and expenditures to the light of publicity . . .

Third, and not least significant, record-keeping, reporting and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contributions limitations described above.

*Id.* at 67–69, 96 S.Ct. at 657–658.

The Act's sponsors envisaged that the concept of voluntary compliance was written into the law. In fact, no enforcement mechanism existed until 1974 when the FEC was established as an independent body to monitor the election law. Up to that time, the law was haphazardly administered by the Secretary of the Senate, the Clerk of the House, the General Accounting Office, and the Justice Department. It was hoped that creation of the FEC would insure independent, impartial enforcement of the election laws, and achieve more efficient management than had occurred when the four separate entities had concurrent responsibilities. *See* Application & Administration of the Federal Campaign Act of 1971, As Amended, Hearings Before the Committee on Rules & Administration, United States Senate, 97th Cong., 1st Sess., (1981) ("Hearings"), Prepared Statement of John Warren McGarry, Chairman, Federal Election Commission, p. 49.

Following the enactment of election reform legislation, Congress has reviewed FEC's enforcement activities. At the hearings conducted by the Committee on Rules & Administration of the United States Senate, criticism surfaced regarding the FEC's strict interpretation and enforcement of the election laws. Many regarded the FEC's litigation practices as merely efforts to "nitpick," rather than to fairly and effectively administer the Act. Among the alleged ridiculous examples cited was the case of *FEC v. John Adams* where a Mr. Adams ran for Congress in New Hampshire in 1976 and lost. He came to the attention of the FEC because he had failed to file the correct forms for his candidacy, despite numerous requests from the Commission to do so. The FEC sent one of its

top litigators to New Hampshire to prosecute Mr. Adams. A federal district court defaulted him, ordered him to file required reports, and pay a fine. It was later learned that Mr. Adams was an elderly man who had not been able to attend the court hearing, was sick at an old soldiers and sailors home, and that he had failed to file because he had no finances to report. He did not even have the price of a stamp to respond to the FEC's warnings. *See,* Hearings, Prepared Statement of Paul D. Kamenar, Washington Legal Foundation, p. 86; Supplementary Material, pp. 165, 242.

In addition to appraising enforcement efforts, Congress has re-examined the construction of the law itself. At the Senate hearings, the Rules & Administration Committee took testimony concerning the burdens of complying with what was generally perceived as an overly complex law. The Act was described by many as "The Lawyers and Accountants Act," because the reporting requirements demand a technical specialization in order to campaign. John Sears, former campaign manager for Ronald Reagan, was quoted as saying that "in the old days, the first person you would hire was a good speech writer. Now the first guy you hire is a good lawyer, the second is a good accountant." *See* Hearings, Supplementary Material, Loren C. Bruce (Republican Study Committee) "Federal Election Commission—How Election Reform Backfired," p. 261.

The instant case presents a microcosm of both enforcement and structural deficiencies in the Act cited at the Senate hearings. But it also illuminates a more troubling aspect of the law, not previously cited. It is the fact that candidates for federal offices are completely shielded from liability for their own campaign's recordkeeping transgressions. This is so despite the fact that the candidate himself plays an important role in soliciting campaign finances. Congress has set up an artful scheme whereby all of the financial activities of a campaign are controlled and reported by the candidate's authorized committee. The

candidate is free to receive contributions[9] and make expenditures, but he does so only as an agent of the authorized campaign committee. 2 U.S.C. § 432(e)(2); 1979 U.S. Code Cong. & Ad.News 2860, 2861. In other words, the statute enables candidates to solicit campaign funds, without being held responsible for any irregularities in reporting such funds, even though the irregularities are engaged in for the benefit of the candidate. Liability, instead, filters through the candidate to his amorphous campaign committee, or, more precisely, to the committee's treasurer, who is legally responsible for any violations of the Act. It is the treasurer, and not the candidate, who becomes the named defendant in federal court, and subjected to the imposition of penalties ranging from substantial fines to imprisonment. 2 U.S.C. § 437g(d). It occurs to the court that in this regard, the Act is perhaps the most ingeniously unfair piece of legislation ever enacted by Congress.

■ At the court's session of September 21, 1984, counsel for the FEC was asked to address this question of candidate liability under the reporting requirements of the Act. Counsel stated that it was Congress' determination, right or wrong, that the treasurer of a political committee is liable for the reporting requirement, and that anyone who accepts the position of treasurer is "put on notice" of his potential liability under the Act. The court finds this an unsatisfactory answer because there exists no specific mechanism of notification by which we can be assured that treasurers understand their responsibilities. Furthermore, the FEC's response serves to underscore the court's belief that Congress has enacted this legislation to protect itself, and not the electorate.[10] While the FEC is nominally empowered to administer the election laws, it is Congress which retains ultimate authority to snuff out regulations which might have the effect of limiting candidates' or incumbents' activities in the election arena.[11] *See* 2 U.S.C. § 437c(b)(2) which was drafted to provide:

> Nothing in this Act shall be construed to limit, restrict, or diminish any investigatory, informational, oversight, supervisory, or disciplinary authority or function of Congress or any committee of the Congress with respect to elections for Federal office.

## III

■ It is against this background that the FEC seeks to have the court hold these defendants in civil and criminal contempt. Civil contempt is remedial and coercive in nature, and is intended to secure compliance with lawful judicial decisions. *In re Irving*, 600 F.2d 1027, 1037 (2d Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979). Defendants have now fully complied with the court's order by filing all required reports, and by paying part of the fine imposed and proposing a schedule for the remainder. In such an instance, the coercive purposes of civil contempt are inapplicable, and would not be served by imposition of sanctions on defendants.

■ The FEC urges, however, that a secondary purpose of civil contempt is to compensate the opposing party for damages suffered. Compensation may be provided for actual damages. *United States v. United Mine Workers*, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). While the FEC seeks an additional fine of $5,000, there is no evidence of actual dam-

---

**9.** It is, however, unlawful for a candidate, Senator or Representative, or person who receives salary or compensation from money derived from the Treasury of the United States to solicit contributions from other officers or employees of the government. 18 U.S.C. § 602.

**10.** As an example of the self-serving nature of election legislation, *see* 2 U.S.C. § 439(a) which provides, *inter alia,* that in the case of an indi-

vidual who is a Senator or Representative excess campaign funds and funds donated may be converted for any personal use.

**11.** In fact, prior to the 1979 Amendments, candidates were also responsible for reporting requirements under the Act. The ostensible purpose of the Amendments was "to simplify recordkeeping and reporting provisions." 1979 U.S.Code Cong. & Ad.News at 2861.

ages beyond the $5,000 fine already imposed, which defendants do not contest, and which adequately compensates the FEC, including its costs of pursuing this proceeding.[12] Nor does the court find that the FEC has substantiated its claim that the public suffered quantifiable damage by virtue of defendants' delay in compliance.[13] The court therefore rejects this alternative ground for imposition of civil contempt sanctions.

The FEC would also have the court hold defendants in criminal contempt. A person may be held in criminal contempt under the Act if his violation of the court's order was "knowing and willful." 2 U.S.C. § 437g(a)(11). There is no evidence here that defendants knowingly and willfully violated the default judgment order. If anything, the opposite is true. Once before the court in response to the Rule, and apprised by counsel of his responsibilities, Thomas J. Savage, on behalf of himself and the Committee, made every effort to comply with the court's order. That compliance came at great personal cost to Mr. Savage: he was forced to hire a lawyer and an accountant, and to shoulder alone the burden of a heavy civil penalty he could ill afford. These obligations were foisted upon him by a self-serving and inequitable federal law which protects a candidate from liability for recordkeeping violations, while leaving his underlings (here, a son) to pay the piper. We know from the Scriptures that the iniquities of the father are visited upon the children unto the third and fourth generation. *Exodus* 20:5. In this case, it appears that the sins of the father are burdening the first generation alone.

Having reviewed Mr. Savage's actions which led to imposition of the default order, the court is satisfied that his failings as treasurer of his father's campaign flowed largely from the fact that he was unsophisticated in the ways of reporting under the Act, and was "the wrong man for the job." As the affidavit of Wayne Parsons, Mr. Savage's accountant, attests: "Mr. Savage was intimidated by communications which he received from the Federal Election Commission in response to his reports. I believe, based upon my experience with Mr. Savage, that his failures reflect fear and incapacity, and not bad faith." The court agrees. At no time did Mr. Savage's conduct rise to a contumacious level which would warrant a finding of contempt.

Under such circumstances, it is clear that there are no grounds for imposing civil or criminal sanctions upon defendants, and that their actions taken since September 17, 1984, have purged their prior noncompliance with this court's order. *See* 17 C.J.S. Contempt § 105 (1963); *In re Farkas*, 204 Fed. 343 (E.D.N.Y.1913); *Ryan v. Superior Court of California in and for Sacramento County*, 49 Cal.App. 71, 192 P. 1036 (1920). This court therefore declines to set precedent and impose civil and criminal contempt citations on the Committee and its treasurer, Thomas J.

---

**12.** According to the FEC, it incurred $3,297.62 in attorney's fees and costs in prosecuting this action.

**13.** The public does not evince much interest in examining candidates' campaign reports. According to John W. McGarry, Chairman of the FEC, 13,000 people visited the FEC in 1980 to examine documents. When asked by the Committee on Rules & Administration of the United States Senate what sort of people made up the visitors' list, Chairman McGarry replied that the press accounted for a major amount of this activity. Another very important group was the candidates and their staffs. "Candidates watch one another very closely; they bird dog one another's campaign reports," McGarry reported. The Chairman said that he would list third, the academic interest, "which is fairly sizable," and beyond that, "my observation is that there really is not wide, general public interest...." *See* Hearings, Statement of John W. McGarry, Chairman, FEC, p. 46.

In the instant case, Rep. Savage's overwhelming victory in November, 1984, indicates that his constituency solidly supports his candidacy, and would not subscribe to the concept that it had been harmed by a delay in disclosure regarding 1982 campaign finances. It is important to remember that the reports of that campaign, once filed, did not show any underlying campaign improprieties or hidden misconduct. Had improprieties been discovered, there might be cause for a finding of harm to the public through delay in disclosure.

Savage. Accordingly, the Rule to Show Cause, issued September 12, 1984, is hereby discharged.

So ordered.