**FEDERAL ELECTION COMMISSION,**
**Plaintiff–Appellee,**

v.

**James TOLEDANO, Defendant–**
**Appellant.**

**No. 01–56762.**

United States Court of Appeals,
Ninth Circuit.

Argued July 9, 2002.

Submitted Sept. 2, 2002.

Filed Nov. 7, 2002.

As Amended on Denial of Rehearing
Jan. 30, 2003.

James Toledano, pro se, Santa Ana, CA, for the defendant-appellant.

Vivien Clair, Attorney, Federal Election Commission, Washington, DC, argued for the plaintiff-appellee. Lawrence H. Norton, General Counsel, and Richard B. Bader, Associate General Counsel, Federal Election Commission, Washington, DC, joined her on the brief.

Before: KOZINSKI and FERNANDEZ, Circuit Judges, and KING,* District Judge.

KOZINSKI, Circuit Judge.

Any person who receives a contribution in excess of $50 for a political committee must forward the contribution and the donor's information to the committee's treasurer "no later than 10 days after receiving the contribution." 2 U.S.C.

---

* The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

§ 432(b)(2)(B). We plumb the deep mysteries of this language to figure out what it could possibly mean.

## I

James Toledano, a lawyer admitted to practice in California, was chairman of the Orange County Democratic Party during the 1996 primary election. About three weeks before the primary, he received a $10,000 contribution check at his law office. The check was made out to the "Democratic Party of Orange County" by Debra and Paul LaPrade, sister and brother-in-law of James Prince, one of four candidates seeking the party's nomination for California's 46th Congressional District. Unbeknownst to the party's treasurer or anyone else, Toledano took the check to a bank, opened a new account in the name of "Democratic Party of Orange County II (Federal)" and deposited the money. At some point after the check was written, the roman numeral "II" was mysteriously added to the payee line to match the name of the account. Instead of providing the party's contact information for the new account, Toledano listed his law office's address and telephone number, and gave himself sole signatory authority.

That evening, Toledano attended the party's executive committee meeting, where the treasurer and other board members were present. Toledano said nothing about the contribution, even though he reported various other matters to the board, and even though the $10,000 check was hardly routine. It was, in fact, twenty-five times the next-largest donation to the party that year. Days and weeks passed—to say nothing of the ten-day statutory deadline—yet the treasurer remained in the dark. Toledano's failure to forward the check and the donors' information to the treasurer was no oversight. Toledano later admitted that he intentionally kept the contribution secret because he knew that, if he told anyone, his plan for the money would be thwarted.

And a plan he did have. Money in hand, he secretly arranged with James Prince's campaign staff—Prince for Congress—to print and mail pamphlets, complete with Prince's photograph, notifying voters of Prince's endorsement by the Democratic Party.[1] The pamphlets consumed all the funds in the undisclosed account, plus $277.87 from Toledano's own pocket.

Prince lost the primary, but with publicity comes scrutiny. When the other members of the party's executive committee found out about the mailings, they reported Toledano's manipulations to the press. The Federal Election Commission (FEC) began an investigation. It discovered that sister Debra and brother-in-law Paul LaPrade had already contributed the maximum allowable amount to Prince's election campaign before they made their latest donation. The LaPrades admitted to the FEC that the $10,000 check, although ostensibly made to the Orange County Democratic Party, was actually earmarked for Prince's election pamphlets and designed to evade campaign contribution limits, in

---

1. The pamphlet actually features two candidates, James Prince and Lou Correa, a candidate for the 69th State Assembly District. No one disputes, however, that the pamphlet was primarily intended to promote Prince's candidacy. On the pamphlet, Prince's endorsement by the party stands out in large red font whereas Correa's is only in a modest print. There is a portrait of Prince, but none of Correa. Inclusion of Correa in the pamphlet is consistent with advice Toledano is said to have given Prince to the effect that "it would be legal for people to contribute to the Orange County Party [for the purpose of promoting Prince's candidacy] even if they had already given [Prince's] campaign the maximum permissible contribution, so long as the slate-mailer mentioned a sufficient number of candidates." Declaration of Harvey Prince (James Prince's father) at 2–3.

violation of 2 U.S.C. § 441a(a)(1)(A) ("No person shall make contributions to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $1,000."). *See* 11 C.F.R. § 110.1(h)(2) (providing that a contributor may not evade limits on how much he can donate to a candidate's campaign by giving money to a political committee "with the knowledge that a substantial portion will be contributed to, or expended on behalf of, that candidate for the same election"). The LaPrades and Prince for Congress soon conceded wrongdoing and paid a hefty fine. But not Toledano.

The FEC brought this enforcement action in federal district court seeking civil penalties and other relief against Toledano for violating the Federal Election Campaign Act (FECA). Representing himself below and on appeal, Toledano admits that he spoke to Debra LaPrade about the contribution and told her to send the check to his law office rather than to that of the Democratic Party; that he didn't tell anyone from the party about the contribution; and that he spent all the money on Prince's campaign. He agrees that he neglected to send the contribution or the donors' information to the treasurer within ten days—or ever. *See* 2 U.S.C. § 432(b). Still, Toledano insists that he didn't violate the law and that the district court erred in granting summary judgment against him.

Toledano maintains that 2 U.S.C. § 432(b), despite its mandatory and straightforward language, cannot mean what it says. He contends that there are disputed issues of material fact that, if decided in his favor, would excuse his failure to comply with the statutory requirement. Toledano also marshals a pastiche of other arguments—judicial estoppel, statute of limitations, and the district court's abuse of its broad remedial discretion—to challenge the district court's decision.

## II

Toledano stated under oath: "I received the [$10,000] check[.] I took it to Marine National Bank, . . . . and opened a new account with it. . . . I listed myself as the signatory . . . . I used my office address on the account . . . ." He did all these things "without consulting the Executive Committee or the Treasurer" and kept his actions under wraps past the statutory ten-day deadline because "I had formed the habit of doing everything . . . without notifying the Executive Committee because I knew that whatever I wanted would be voted down for no other reason than spite and vindictiveness." [2]

It is undisputed, therefore, that Toledano (1) received a contribution, (2) whose amount exceeded $50, and (3) failed to present the contribution or the donors' names and addresses to the treasurer within ten days. The relevant statutory provision states as follows:

*Every* person who receives a contribution for a political committee which is not an authorized committee *shall*—. . . if the amount of the contribution is in excess of $50, forward to the treasurer such contribution, the name and address of the person making the contribution, and the date of receipt of the contribution, no later than 10 days after receiving the contribution.

2 U.S.C. § 432(b)(2)(B) (emphasis added). On its face, Toledano's conduct appears to be a clear violation of the statutory requirement. But Toledano denies he did

---

**2.** Toledano explains why the other members of the executive committee were so opposed to him: "I was operating in the best interests of the Democratic Party as I saw it. They were operating in furtherance of their own personal agenda." Deposition of James Toledano at 80.

anything wrong because "Congress did not and could not have intended such a mechanistic view of the statute."

Toledano derisively calls the FEC's interpretation of the statute the "fingerprint rule." It simply cannot be, he asserts, that "literally hundreds of thousands of campaign contribution checks, representing literally millions of dollars," must pass through the treasurer's own hands and be impressed with the treasurer's fingerprints. The treasurer must be permitted to have agents who assist him, and he, Toledano, was one such agent. As chair of the party, he was entitled to accept and deposit contribution checks.

Toledano does not claim that the treasurer actually authorized him to act on the treasurer's behalf, or that the party's bylaws gave the chair such authority; Toledano readily admits that his actions violated the bylaws. *See* Supplemental Declaration of James Toledano at 9–10. Toledano nevertheless maintains he had de facto authority to act as treasurer because he was convinced that the real treasurer was incompetent and failed to discharge his duties responsibly.

According to Toledano's sworn declaration and deposition, "the painful reality [was that] the Treasurer of the Orange County Democratic Party ... was unreachable for days on end," "getting harder and harder to find," and becoming "less and less responsible." "As a result, the last thing that I would ever have done would be to give [the treasurer] a check the proceeds of which needed to be spent in a hurry." The executive committee, moreover, was paralyzed by continuing hostilities; the members were "virulent and vicious." Therefore, Toledano explains, "[i]t became totally obvious to me that I would get nothing done if I tried to work with the [committee]." "I could have proposed God, motherhood and apple pie, and it would have been voted down.... As

a result of that, I never even thought about telling [the committee]."

■ We agree with Toledano that the statute does not impose a mechanistic "fingerprint rule." The treasurer is authorized to employ designated agents to assist him. *See* 2 U.S.C. § 432(a) (requiring the "authorization of the treasurer or his or her *designated* agent" (emphasis added)); 11 C.F.R. § 102.9 ("The treasurer of a political committee or an agent *authorized* by the treasurer to receive contributions and make expenditures shall fulfill [the listed] record keeping duties ...." (emphasis added)). But, as noted, Toledano did not have actual authority to act for the treasurer, and the party's bylaws gave him no authority to receive and spend money without the approval of the executive committee. Toledano was therefore not a designated agent of the treasurer and could not exercise the treasurer's authority under the statute or the regulations.

■ Toledano's "de facto treasurer" argument fares no better. The statute makes no provision for agents who lack proper delegation of authority, even if the treasurer goes AWOL. Quite the contrary, "[n]o contribution or expenditure shall be accepted or made by or on behalf of a political committee during any period in which the office of treasurer is vacant." 2 U.S.C. § 432(a). A fortiori, when there *is* a treasurer, no contribution or expenditure may bypass him or his designated agents. We cannot undo the plain language of the statute to achieve what Toledano views as the better result, even if we were inclined to do so, which we are not.

■ Assuming, as Toledano alleges, that the party's executive committee was plagued by paralysis, it makes not an iota of difference under FECA. The statute contains no exception for "internal breakdown." Either the members work out

their differences and follow the statutory requirements, or the committee cannot accept contributions or make campaign expenditures at all. *See* 2 U.S.C. § 432(a).

■ Toledano resists this obvious conclusion by pointing to his own experience and the rough-and-tumble world of Orange County political campaigning: "In acting on my own," Toledano explains, "I had plenty of history on my side." Toledano claims that "it was not uncommon nor wrong for the Chair of the Party to act independently of the Executive Committee and the Central Committee and without the knowledge of the members of those committees although that violated the express language of the By-laws." In fact, "it was customary for the Central Committee and its officers to disregard [bylaw] requirements without even thinking about it" when doing so "suited them." Toledano also alleges that he has "personally seen contribution check envelopes being opened and the checks tabulated, booked and taken directly into the bank by persons who were not the designated campaign treasurer." Toledano claims he "discussed this fact with several individuals employed by the FEC. Not one has ever denied that checks are indeed routinely deposited directly into the bank by

persons other than the designated campaign treasurer without the treasurer ever having seen them, and that the FEC has never prosecuted any person for such a hypertechnical alleged violation."

That several unidentified "individuals employed by the FEC" have failed to contradict Toledano's claims proves nothing. The individuals in question may simply have recognized that campaign treasurers often act through duly authorized agents. In any event, that others may have violated the campaign laws in the past has no bearing on the lawfulness of Toledano's conduct. The only question before us is whether Toledano violated the law. If he did, he gets no free pass because others may have been better at escaping detection.[3]

■ Toledano next argues that section 432(b)'s requirements are so mechanistic and irrational that we cannot possibly hold anyone to them. But he is mistaken— both in his premise and in his conclusion. It is axiomatic that "disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Buckley v. Valeo*, 424 U.S. 1, 67, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). In addition, "record-

---

**3.** We are mindful that Toledano's claim of rampant campaign-law illegality within the Orange County Democratic Party implicates the reputations of individuals who are not parties to these proceedings and have no means of defending themselves. We note, therefore, that the record contains no evidence supporting Toledano's charges; indeed, there is evidence to the contrary. Marti Schrank, a long-time member of the Orange County Democratic Party's central and executive committees, states in her declaration:

Based on my experience with the Orange County Democratic Party's Executive Committee and Central Committee, including two terms as Vice–Chair under two Chairs who preceded Mr. Toledano, I am not aware of any situations in which Chairs

made substantial expenditures, such as an expenditure of $10,000, on behalf of the Party for activities that had not been authorized by the Central or Executive Committees.

Amended Declaration of Marti Schrank at 11.

Because we deem the issue irrelevant to our decision, we need not resolve the factual dispute between Toledano's and Schrank's versions of how business is conducted by the Orange County Democratic Party. Suffice it to say that, in light of Toledano's persistent lapses of memory, *see* pp. 949–50 *infra*, and his demonstrated penchant for playing fast and loose with the truth, *see, e.g.,* n. 10 *infra*, his charges against others should not be accepted at face value.

keeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations." *Id.* at 67–68, 96 S.Ct. 612. Precisely because of the difficulty in keeping track of "literally hundreds of thousands of campaign contribution checks, representing literally millions of dollars," there is nothing irrational about Congress's decision to insist that all funds coming into, and going out of, a committee pass through a single entry-exit point—the treasurer.

The treasurer thus plays a pivotal role in the statutory scheme. The Act requires every political committee to have a treasurer, 2 U.S.C. § 432(a), and holds him personally responsible for the committee's recordkeeping and reporting duties, *id.* §§ 432(c)-(d), 434(a). Every political committee must designate accounts at one or more official "campaign depository or depositories," into which "[a]ll receipts received by [the] committee shall be deposited" and from which all disbursements (other than petty cash disbursements) must be drawn. *Id.* § 432(h)(1). The treasurer stands guard over these accounts and "file[s] reports of receipts and disbursements in accordance with the provisions of [2 U.S.C. § 434(a)]." *Id.* § 434(a)(1). The treasurer is also responsible for examining "all contributions received for evidence of illegality and for ascertaining whether contributions received, when aggregated with other contributions from the same contributor, exceed the contribution limitations." 11 C.F.R. § 103.3(b). Congress deems the treasurer so important that the financial machinery of the campaign grinds to a halt when the office becomes vacant. 2 U.S.C. § 432(a).

To recognize unauthorized "de facto agents" of the treasurer and thus open up multiple points of entry and exit through which campaign funds may flow is to create predictable confusion and unravel the whole statutory scheme. The facts of this case demonstrate the very evil Congress sought to prevent and deter. By circumventing the process, Toledano guaranteed that the LaPrades' contribution escaped the kind of skeptical scrutiny the statute and regulations provide for. Had Toledano followed the statutorily mandated procedure and handed the check and the donors' information to the treasurer, questions would certainly have been raised about the legality of such a large and highly unusual contribution; this, in turn, could easily have led to the discovery of the LaPrades' relationship to Prince and their effort to circumvent campaign contribution limits. Federal law makes the treasurer responsible for detecting precisely such illegalities, 11 C.F.R. § 103.3(b), and holds him personally liable if he fails to fulfill his responsibilities, *see* 2 U.S.C. § 437g(d); *FEC v. Gus Savage for Congress '82 Comm.*, 606 F.Supp. 541, 547 (N.D.Ill.1985) ("It is the treasurer, and not the candidate, who becomes the named defendant in federal court, and subjected to the imposition of penalties ranging from substantial fines to imprisonment."). As Toledano admits, had he reported the contribution, the money would not have been spent for the illegal purpose. By cutting the treasurer out of the process, Toledano prevented the kind of scrutiny of the LaPrades' contribution that Congress contemplated.

■ Finally, Toledano maintains that "[n]o purpose of [the Act] was violated by [his] failure to hand the check to the treasurer." When the treasurer discovered his malfeasance, Toledano explains, the treasurer still had plenty of time to file the required monthly and quarterly reports. Therefore, Toledano concludes, the party's violation of its reporting obligation was not due to his transgression, but to the treasurer's delay in doing his job. His own

action was "an absolute[ly] innocent decision," and even if there was a violation, it was "in the most definite sense a no harm no foul kind of an injury." In Toledano's view, the district court erred in adhering to a "mechanistic and purely literal interpretation of the statute."

■ As already explained, however, we do not believe that failure to report the contribution to the treasurer before the money was spent was harmless. To the contrary, Toledano's failure to turn the funds over to the treasurer as the law requires made the illegal $10,000 expenditure possible. "Congress enacts statutes, not purposes, and courts may not depart from the statutory text because they believe some other arrangement would better serve the legislative goals." *Cavanaugh v. U.S. Dist. Court (In re Cavanaugh)*, 306 F.3d 726, 731–32 (9th Cir.2002). Toledano concedes that he violated the explicit requirements of the statute. Because none of his finger-pointing and complaining creates a genuine issue of fact material to the application of the law, that should have been the end of the story long ago.

## III

We have even less trouble rejecting Toledano's remaining arguments.

**A.** The district court found that Toledano did not timely raise the judicial estoppel issue—namely, the FEC has alleged facts in this litigation inconsistent with those set out in the conciliation agreements with the LaPrades—and therefore concluded that Toledano waived the argument. Because Toledano does not challenge the district court's conclusion that the argument was waived, we need not address his judicial estoppel argument on the merits. *See Paracor Fin. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1168 (9th Cir.1996).

■ **B.** Toledano's argument that the three-year statute of limitations applicable to criminal prosecutions also applies to civil suits is risible. The statute to which Toledano points reads:

No person shall be *prosecuted*, tried, or punished for any violation of subchapter I of this chapter, unless the *indictment* is found or the *information* is instituted within 3 years after the date of the violation.

2 U.S.C. § 455(a) (emphasis added).

■ Once again, Toledano would have us ignore the language of the statute, which refers unmistakably to criminal prosecutions. What's more, he asks us to disregard *FEC v. Williams*, 104 F.3d 237, 240 (9th Cir.1996), which rejected precisely this argument in holding that the five-year general statute of limitations, 28 U.S.C. § 2462, "applies to FEC actions for the assessment or imposition of civil penalties under [the Federal Election Campaign Act]." *Williams*, 104 F.3d at 240. Toledano urges us to overturn *Williams* because the opinion is, in his view, poorly reasoned. But it has long been the rule that "only a panel sitting en banc may overturn existing Ninth Circuit precedent." *United States v. Camper*, 66 F.3d 229, 232 (9th Cir.1995). Williams, moreover, is plainly right. Because the FEC's action was brought within the five-year statute of limitations, it was timely.

■ **C.** Toledano also claims that the district court abused its discretion in setting the amount of the penalty at $7500. He bases his attack on two grounds. First, although he never suggested to the district court that he was unable to pay, Toledano now argues that the court erred in failing to consider his financial circumstances before imposing the fine. We can quickly reject this argument. It is settled that the "sanctioned party has the burden to produce evidence of inability to pay."

*See, e.g., Gaskell v. Weir,* 10 F.3d 626, 629 (9th Cir.1993). "Simple logic compels this result: [T]he sanctioned party knows best his ... financial situation." *Id.* Because Toledano failed to adduce any evidence of his inability to pay and did not even raise the issue below, the argument is waived.[4]

Toledano's second ground of attack requires a bit more discussion. In arriving at the $7500 penalty, the district court relied on two factors we have identified as relevant in determining the amount of fine— bad faith and injury to the public. *FEC v. Furgatch,* 869 F.2d 1256, 1258 (9th Cir. 1989). Toledano claims that the district court improperly "weigh[ed] and judg[ed] Toledano's reasons and motive, intent and purpose" in finding bad faith. "[B]y word and phrase," the district court's order incorrectly implied that Toledano was "intentionally devious and deceptive" and that he "was a Prince supporter and conspired with Prince to produce the mailer." Further, according to Toledano, the district court erred in concluding that Toledano's "trivial" violation harmed the public.

We first address Toledano's "bad faith" argument. Toledano insists that he had no idea that the LaPrades were related to Prince and no suspicion that they were trying to evade campaign laws by funneling money to Prince through him and the Democratic Party. Although Toledano admits in his affidavit that he had earlier endorsed Prince's candidacy, he says he "had forgotten." Furthermore, he claims, "I have no recollection of ever being in the Jim Prince for Congress headquarters, although it is likely that I was." Even though Toledano worked with the Prince campaign and the campaign's printer to produce the pamphlets, he insists, "I do not recall who I talked to .... I don't recall recognizing to whom I was speaking.

I vaguely recall working with the printer on the format and colors for the design ..., [but] I don't really recall the 'Jim Prince colors' issue .... I had no idea that the [mailing house] was working with the Prince campaign on this.... And I had no idea that proofs were sent to the Prince campaign ...."

Toledano's answers at his deposition are equally opaque:

Q: Did anybody suggest the idea of a slate mailer to you?

A: I have no recollection. It's entirely possible....

. . . .

Q: What general discussions did you have with Mr. Prince?

A: At one point, Prince contacted me or spoke to me at some function—I don't know—either in telephone or in person, in which he said something to the effect of wanting to—that's possibly where I got the idea—of wanting to fund something from the party related to the party endorsements.

. . . .

*Q: Did you say anything back to him?*

A: I have no specific recollection. I'm sure I said something friendly and noncommital....

Q: Would you have given [Prince] any reason to believe that if cash was in the hand that you would be amenable to producing some sort of mailing that trumpeted Mr. Prince's endorsement by the California Democratic Party?

A: I'm sure I said nothing to discourage him.

Q: Is that a "yes"?

A: I can't give you a "yes." I don't recall what I may have said.

In his declarations and those portions of his deposition that are part of the district court record, Toledano invokes phrases

---

**4.** Toledano's argument seems to be a red herring in any event. *See* pp. 953–54 & n. 10 *infra.*

such as "I don't recall," "I forgot," "I'm not entirely sure," and "I have no independent recollection" over five dozen times.

In order to survive a motion for summary judgment, the responding party must present competent evidence that creates a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is no longer enough to deny the moving party's allegations in a general way, or to demand that the moving party be "put to its proof." *See id.* at 248, 106 S.Ct. 2505. Rather, the party against whom a summary judgment motion is brought must present evidence that, if presented at trial, would support a judgment in its favor. *See id.* at 250–51, 106 S.Ct. 2505. Toledano's repeated failures of recollection, and his steadfast denials that he collaborated with the LaPrades to circumvent federal campaign laws, fall far short of satisfying this standard.

The FEC presented competent evidence that Toledano knew Prince and had given him an endorsement; that Prince and Toledano discussed the possibility of having the party create a publication relating to the endorsement, if only the Prince campaign could come up with the money to fund it; that sometime afterwards the LaPrades—who lived in Arizona and had no obvious connections with Orange County—gave Toledano a $10,000 contribution;[5]

that Toledano instructed Debra LaPrade to send the check to his law office rather than to the party's headquarters; that he concealed the contribution from fellow members on the party's executive committee, including the treasurer, and proceeded to spend every cent of it on a mailer featuring Prince; and that, in doing so, he used the same printer as the Prince campaign, produced a pamphlet using Prince's campaign colors, and sent it to people on the Prince campaign's mailing list. Toledano admits some of these facts; as to others, he claims he had no recollection or that he was unaware of them. But failure to remember and lack of knowledge are not sufficient to create a genuine dispute. The district court was entitled to treat these facts as established for purposes of summary judgment.

What Toledano really disputes is his complicity in the LaPrades' scheme to circumvent the campaign laws—in other words, the state of mind animating his actions. Toledano claims in essence it was just a big coincidence that he used the $10,000 contributed by Prince's sister and brother-in-law to produce a mailer endorsing Prince and have it sent to 29,000 people on Prince's campaign mailing list—precisely as the LaPrades intended that the money be used.[6] But state of mind is not subject to proof through the normal means used to establish facts in the physi-

---

**5.** Toledano admitted at his deposition that the contribution was out of the ordinary:

> Q: Didn't you think [the LaPrades'] contribution was unusual in any way?
>
> A: Very unusual. But when you've got a fish on a hook that doesn't have a barb and you want that fish, you are very delicate about how you reel it in.... And as I said, it was probably horribly naive of me. But I wasn't about to start pushing [Debra LaPrade] around and maybe making the money go away.

Deposition of James Toledano at 140–41.

Toledano explained in his declaration that it "never occurred to me to cross-examine [De-

bra LaPrade] and potentially drive her away, particularly since my family has repeatedly told me that I have a tendency to cross-examine *them* and I am very sensitive to the impact that such conduct has on people." Supplemental Declaration of James Toledano at 7.

**6.** James Prince's father, Harvey Prince, gave the following account:

> Ultimately, my daughter Debbie LaPrade and her husband Paul LaPrade were asked to fund the slate-mailer because they did not plainly have a connection to the campaign—their last name was not "Prince"

cal world, such as eyewitness testimony. State of mind is something the trier of fact must infer from the surrounding circumstances. The individual whose state of mind is at issue can give an "eyewitness" account of sorts, but the trier of fact is not bound to believe it. Toledano's protestations that he lacked bad faith are insufficient to create a genuine issue of material fact to defeat summary judgment; the district court was entitled to draw negative inferences about his state of mind based on Toledano's suspicious memory lapses and the undisputed evidence presented by the government.[7]

The district judge here had before him all the facts and circumstances surrounding Toledano's actions, plus Toledano's repeated claims of failure of memory and protestations of innocence. Toledano asks for a hearing, but suggests absolutely no additional evidence that he could or would have presented at such a hearing; the record was complete. Based on the evidence presented, the district court was entitled to determine that any rational trier of fact would disbelieve Toledano's repetitive claims of bad memory, reject his protestations of innocence, and conclude that Toledano accepted the $10,000 check subject to an express or tacit understanding that the money would be used to fund the Prince pamphlet. This was enough to establish the requisite bad faith supporting the district court's $7500 fine, but there is more.

As Toledano concedes, his actions vis-à-vis fellow members of the party's executive committee were hardly a model of forthrightness and honesty. He schemed to bypass the party's organizational structure by accepting a very large contribution and spending it as he saw fit, disregarding the organization's internal checks and balances designed to avoid unilateral action. There is also strong evidence that, in pursuing these ends, Toledano altered the payee on the check by adding the roman numeral "II" following "Democratic Party of Orange County." [8]

and they resided in Arizona, not California. I personally solicited the two contributions for the Orange County Democratic Party that are at issue in this litigation, for $5,000 each, from Debbie and Paul and told them exactly to whom to make the check payable. I got the "payee" information from my son, Jim. I told Debbie and Paul that the money would fund a slate-mailer featuring Democratic candidates, including Jim. I also told my daughter and son-in-law what I thought to be true—that it would be legal for them to contribute even though they had each given my son's campaign the maximum permissible contribution because the slate-mailer was allowed despite their earlier contributions. They agreed to make the contribution, and did make the contribution.

Declaration of Harvey Prince at 3–4.

7. Because it is the judge, not a jury, who determines the amount of the fine, this is not a case where the judge's drawing of inferences based on the undisputed facts might have usurped the jury's prerogatives.

8. The evidence concerning this alteration is clear-cut and undisputed. Paul LaPrade stated under oath that he made the check out to "Democratic Party of Orange County," that "I am certain that I did not write 'Democratic Party of Orange County II' on its face. I believe that someone else added the 'II' after I wrote the check." Declaration of Paul W. LaPrade at 3.

Harvey Prince stated that he might have delivered the contribution check to Toledano's law office, "but I am certain that I did not write on the check in any way." Declaration of Harvey Prince at 4.

The inference that the numeral "II" was added after the check was originally written is supported by the fact that the "Democratic Party of Orange County II" account didn't come into existence until Toledano set it up, check in hand. Toledano claims in his deposition that the "II" "doesn't look like my handwriting" and that "it's entirely possible the bank did it in conformity with the way I told them to label the account." Deposition of James Toledano at 161. But he presented

The alteration to the check, which quite likely amounts to forgery under the applicable state law, *see* Cal.Penal Code § 470; *Atwell v. Mercantile Trust Co.*, 95 Cal. App. 338, 345, 272 P. 799 (1928) ("The alteration of the payee's name on the face of the checks constituted forgery under section 470 of the Penal Code . . . ."), and the unauthorized diversion of funds donated to the party, which seems to fit the definition of embezzlement, *see* Cal.Penal Code § 504; *People v. Talbot*, 220 Cal. 3, 15, 28 P.2d 1057 (1934) ("[I]n every case where the officers of a corporation who are necessarily entrusted with the money and property of the concern use it, knowingly and intentionally, for their own purposes, there is a 'fraudulent appropriation' thereof which is termed embezzlement by the statute . . . ."), are not—as Toledano claims—merely "political sins" unrelated to the enforcement of the federal campaign laws.[9] Rather, Toledano's deliberate and repeated violations of his party's internal procedures—not to mention his likely violations of applicable state laws—were the sine qua non of the federal campaign law violations that he and others committed.

■ Federal campaign laws, like federal laws in general, are interstitial in character. They establish rules for the handling and reporting of campaign contributions by individuals and organizations, but they do not fully prescribe operating procedures for them. Federal law presupposes, rather, that state law and internal bylaws will supply the organizational structure, and that this structure will be respected and followed by those involved. When an individual takes it upon himself to deliberately and massively disregard the applicable state laws or internal procedures, and this noncompliance causes or facilitates a violation of the federal campaign laws, the bad faith involved in undermining the organization's structure is fully attributable to the violation of the federal campaign laws.

Toledano's misconduct is not, as he argues, an unrelated "political sin," nor did he simply run "headfirst into a technicality." Rather, Toledano intentionally short-circuited the procedures Congress rationally relied upon to help ensure compliance with federal disclosure and reporting requirements, and prevent other violations of federal election law. The district court's determination that there is no genuine issue of material fact that Toledano acted in bad faith is amply supported by the record. Indeed, there is no other permissible conclusion.

---

no evidence to support this far-fetched speculation.

**9.** We are not overstating Toledano's argument. Here it is, in his own words:

The only conduct in the record to which any negative references may be made was Toledano's admitted concealment of his actions from his political adversaries which, no matter how egregious a political sin it may have been was hardly what Congress could have had in mind when FECA was enacted and which, if it is material, represents a genuine issue of fact that could not properly be decided on summary judgment without weighing and judging Toledano's reasons and motive, intent and purpose. While the district court was emphatic to the contrary, a desire to further one's political objectives is not *per se* evidence of campaign law bad faith, and there was no evidence, even disputed, that Toledano was trying to prevent the contribution from being reported, or to interfere with Federal election laws, quite to the contrary, but only that he naively seized on what appeared to be an opportunity to publicize the party that he headed, in the teeth of political and personal issues, and ran headfirst into a technicality.

Appellant's Opening Br. at 28–29. And again: [T]he FEC has confused its role. It is not charged with enforcing some generalized standard of morality on the American political scene . . . .

Appellant's Reply Br. at 26.

■] The district court's determination that Toledano's misconduct harmed the public is equally inescapable. Public harm can be presumed "from the magnitude or seriousness of the violation" of the FECA. *Furgatch*, 869 F.2d at 1259. As previously discussed, Toledano's machinations enabled him to spend the illegal $10,000 contribution to promote a candidate in the heat of a campaign. In a primary congressional election, this is far from a trivial sum and could well have made a difference. That Prince lost anyway, and the violation thus had no effect on the outcome of the election, does not change the fact that the public was harmed by the infusion of illegal campaign funds. The district court's $7500 fine, significantly less than the amount improperly spent to sway the election, was quite generous to Toledano in light of his admitted misdeeds, and certainly was not an abuse of discretion.

## IV

■ Although the FEC did not request attorney's fees on appeal, we invoke our inherent power to "protect[ ] the due and orderly administration of justice" and "maintain[ ] the authority and dignity of the court," *Cooke v. United States*, 267 U.S. 517, 539, 45 S.Ct. 390, 69 L.Ed. 767 (1925); *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir.1997), and order Toledano to pay the FEC's attorney's fees on this appeal as a sanction for his bad-faith conduct and abuse of the judicial process. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Fink v. Gomez*, 239 F.3d 989, 991–92 (9th Cir.2001).

Toledano cannot fairly claim surprise; he was given repeated warnings that his arguments are frivolous. At the motions hearing, the district judge minced no words in telling Toledano that "there isn't anything to litigate," that his arguments are "completely lacking in any merit, whatsoever," that the judge read his brief "in frank dismay," and that Toledano's position is "somewhat shameful." In its orders, the district court variously characterized Toledano's arguments as "facially inadequate," "specious," "frivolous," "spurious," "far fetched" and "meritless."

But Toledano would have none of it and presses these same arguments on appeal. At oral argument, we advised Toledano that, like the district court, we considered his arguments frivolous. We also deferred submission to give Toledano one last opportunity to pay the fine and avoid further action on our part. Toledano refused to do so.[10]

---

10. In refusing to pay the fine, Toledano sent a letter on his law office stationery implying that he couldn't afford to do so:

When Judge Kozinski cut off oral argument last Tuesday, he told me that if I did not pay the $7,500 penalty imposed against me within a week a published opinion would be filed affirming the district court judgment.

I am no more able to pay that sum today than I was when Judge Feess plucked it out of thin air. I therefore respectfully ask [the clerk of the court] to advise him of that fact. Letter from James Toledano, to Clerk of the Court (July 16, 2002).

While Toledano argues on appeal that the district court erred when it failed to consider his ability to pay in assessing the penalty, *see* p. 948–49 *supra*, he did not claim until this letter that his financial circumstances actually prevented him from paying. Nevertheless, we gave Toledano the benefit of the doubt and allowed him to work out a payment plan consistent with his financial condition. The FEC consented to this procedure, but Toledano advised us that he was simply unwilling to pay. *See* Letter from James Toledano, to Clerk of the Court (Aug. 8, 2002) ("I was not going to pay the $7500 penalty that the District Court had imposed against me without benefit of evidence.").

Although it is Toledano's prerogative to insist that we decide the case, the reference in his original letter to being "no more able to pay that sum today" seems designed to mislead us as to his motives and financial circumstances. While perhaps not an outright lie—the statement is literally true, whether he

We conclude that Toledano "has acted in bad faith, vexatiously [and] wantonly," and has "willfully abuse[d] [the] judicial processes." *Fink*, 239 F.3d at 991 (internal quotation marks omitted). This is an appeal that should never have been taken, and would not have been taken by an attorney exercising independent, dispassionate judgment. Indeed, given the undisputed facts established during the course of the FEC's administrative proceedings and Toledano's own admissions, it was an unjustifiable waste of the taxpayers' money to force the FEC to bring this action to collect a civil penalty that was unquestionably due. We therefore grant the FEC attorney's fees and related expenses on appeal.

## V

We affirm in all respects the district court's order granting the FEC's summary judgment motion and imposing a $7500 fine against Toledano. The case is referred to the Appellate Commissioner for a determination of the FEC's attorney's fees and related expenses in defending this case on appeal. The Commissioner is authorized to enter a judgment for that amount against Toledano.

**AFFIRMED.**

could well or ill afford to pay the fine now and at the time he appeared before the district court—its only conceivable purpose is to create the impression that he wasn't paying the fine because he couldn't afford to do so. This falls below the level of candor we expect from someone who is not merely a litigant, but also an officer of the court.