19-1765-cv
*McKinney v. City of Middletown*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

AUGUST TERM 2020
No. 19-1765-cv

**WILLIAM MCKINNEY,**
*Plaintiff-Appellant,*

v.

**CITY OF MIDDLETOWN, THOMAS SEBOLD, POLICE OFFICER, JOSHUA WARD, POLICE OFFICER, AND MICHAEL D'ARESTA, POLICE OFFICER,**
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Connecticut

---

ARGUED: APRIL 8, 2021
DECIDED: SEPTEMBER 26, 2022

---

Before:      CALABRESI, RAGGI, and MENASHI, *Circuit Judges.*[*]

---

[*] Judge Robert A. Katzmann, originally a member of the panel, died on June 9, 2021. Judge Reena Raggi was subsequently added to the panel. *See* 2d Cir. IOP E(b).

Plaintiff-Appellant William McKinney appeals from the judgment of the United States District Court for the District of Connecticut (Covello, J.) granting the defendants' motion for summary judgment on the ground of qualified immunity. McKinney argues that the defendant police officers violated clearly established law by purportedly using a police canine for a purpose for which it was not trained, failing to give McKinney a warning before releasing the canine, allowing the canine to continue biting McKinney after he ceased actively resisting, subjecting McKinney to a dog bite that may have lasted for two minutes, and otherwise improperly escalating the use of force. McKinney further argues that the district court erred by failing to construe disputed facts and draw reasonable inferences in his favor. We hold that McKinney has not shown that the defendant officers violated clearly established law of which a reasonable person would have known and conclude that the defendant officers are entitled to qualified immunity. We also hold that the district court did not commit reversible error in evaluating the defendants' summary judgment motion. We affirm the judgment of the district court.

Judge Calabresi dissents in a separate opinion.

———

ALEXANDRA ELENOWITZ-HESS (Noam Biale, Heather Yu Han, *on the brief*), Sher Tremonte LLP, New York, NY, *for Plaintiff-Appellant.*

THOMAS R. GERARDE (Beatrice S. Jordan, *on the brief*), Howd & Ludorf, LLC, Hartford, CT, *for Defendants-Appellees.*

———

2

MENASHI, *Circuit Judge*:

Plaintiff-Appellant William McKinney appeals from the judgment of the United States District Court for the District of Connecticut (Covello, J.) granting the defendants' motion for summary judgment on the ground of qualified immunity. McKinney was arrested by officers of the Middletown Police Department in Connecticut for attempting to rob a Subway fast food restaurant. Following his arrest, the officers brought McKinney to the Middletown Police Department headquarters and placed him in a holding cell. After McKinney displayed concerning behavior, the officers decided to transfer McKinney to a padded cell. When the officers attempted to effect the transfer, McKinney threatened and attacked the officers, who used a baton, a police canine, and a taser to subdue him. When the officers secured McKinney in handcuffs, they withdrew the force and arranged for McKinney to be transported to the hospital for treatment of his injuries.

McKinney sued the officers under 42 U.S.C. § 1983, alleging excessive force in violation of his rights under the Fourth Amendment to the United States Constitution. The defendant officers moved for summary judgment, arguing that their use of force was objectively reasonable under the circumstances and that they were protected under the doctrine of qualified immunity. The district court granted the defendants' motion, holding that the defendant officers' use of force was reasonable under the circumstances and did not amount to excessive force in violation of the Fourth Amendment. On appeal, this court affirmed in part and vacated in part, holding that a reasonable jury could conclude that the officers' combined use of a baton, a police canine, and a taser was excessive despite McKinney's resistance. We

3

remanded the case to the district court, expressing no opinion as to whether the defendant officers were entitled to qualified immunity.

On remand, the defendant officers renewed their motion for summary judgment on the ground of qualified immunity. The district court again granted judgment in favor of the defendant officers, holding that McKinney failed to show that the defendant officers violated clearly established law of which a reasonable person would have known. McKinney appeals from that judgment.

McKinney argues that the defendant officers violated clearly established law by purportedly using a police canine for a purpose for which it was not trained, failing to give McKinney a warning before releasing the canine, allowing the canine to continue biting McKinney after he ceased actively resisting, subjecting McKinney to a dog bite that may have lasted for two minutes, and otherwise improperly escalating the use of force. McKinney also argues that the district court failed to apply the proper standard of review to the defendants' summary judgment motion by adopting the defendants' version of events and failing to draw reasonable inferences in his favor. Finally, McKinney argues that the district court's grant of qualified immunity should be reversed on public policy grounds because the doctrine of qualified immunity has reduced the deterrent effect of the Fourth Amendment.

We are not persuaded by these arguments. McKinney has failed to demonstrate that under the specific facts of this case, the defendant officers' incremental and combined use of a baton, a canine, and a taser violated clearly established law of which a reasonable officer would have known. The undisputed facts of the case show that McKinney threatened the defendant officers and

4

actively resisted their efforts to subdue and secure him. Under those circumstances, reasonable officers could disagree as to whether the force the defendant officers applied in this case was lawful. The defendant officers are accordingly entitled to qualified immunity. McKinney's argument that the district court erred by adopting the defendants' account of events and failing to draw reasonable inferences in his favor also fails. With one exception that does not affect the outcome of this case, the district court applied the correct summary judgment standard to McKinney's claims. We reject McKinney's argument that we should deny the defendant officers qualified immunity on public policy grounds. Whatever the merits of McKinney's argument, we are bound to follow the Supreme Court's and our circuit's precedent in assessing McKinney's claim. Under those precedents, the defendant officers are entitled to qualified immunity. We affirm the judgment of the district court.

## BACKGROUND[1]

### I

On the night of February 19, 2011, McKinney was arrested by officers of the Middletown Police Department for the attempted robbery of a Subway fast food restaurant. McKinney was charged with robbery in the first degree, breach of the peace in the second degree, and larceny in the sixth degree. On the night of his arrest, McKinney consumed alcohol, various psychiatric medications, and cocaine.

---

[1] The facts stated herein are drawn from McKinney's response to the defendants' statement of undisputed material facts, submitted pursuant to Local Rule 56(a)(2) of the United States District Court for the District of Connecticut. *See* J. App'x 226-64; D. Conn. L. Civ. R. 56(a)(1)-(2).

Following his arrest, McKinney was placed in a cell in the Middletown Police Department cell block. At some point between 3:45 and 4:30 AM, officers noticed that McKinney had covered his cell camera with wet toilet paper, obstructing the officers' view of his cell. Defendant-Appellee Officer Thomas Sebold approached McKinney's cell and asked McKinney to remove the toilet paper from the camera. McKinney obliged. After Officer Sebold left, McKinney began trying to injure himself by slashing his wrist and upper forearm with an unknown object. McKinney then covered his cell camera for a second time. Officer Sebold, this time accompanied by Defendant-Appellee Officer Joshua Ward, returned to McKinney's cell to instruct McKinney to remove the toilet paper from his cell camera. The officers found McKinney lying on the floor of his cell. McKinney was hostile to the officers and refused to stand up and remove the toilet paper from his cell camera, telling the officers, "Fuck you, you remove it." J. App'x 230.

Officer Sebold again asked McKinney to remove the material from his cell camera. McKinney replied with something to the effect of, "Fuck you. If I'm going to jail, it won't be for something minor. Come in here and I will go to jail for fucking you cops up." *Id.* In light of McKinney's concerning behavior, the officers decided to move McKinney to a padded cell. When the officers told McKinney that they planned to move him, McKinney responded that he would not be leaving his cell. Officer Sebold remained outside McKinney's cell while Officer Ward went to get Defendant-Appellee Officer Michael D'Aresta to assist them. McKinney continued to yell threats at Officer Sebold through his cell door, telling Officer Sebold that he would "fuck [him] up" if he tried to move McKinney to a padded cell. *Id.* at 232.

6

Officers Ward and D'Aresta returned to the cell block with a police canine named Hunter. Officer Sebold instructed McKinney that he needed to move back from his cell door so that the officers could enter, but McKinney refused to comply. McKinney continued to block the door and told the officers that if they wanted him, they would need to come in and get him. At that point, Officer D'Aresta readied Hunter by giving him the "watch him" command. *Id.* at 235. Officer Sebold cracked open the cell door. McKinney clenched his teeth and fists, looked Officer Sebold in the eye, and said, "Come on." *Id.* at 236.

McKinney picked up the foam mattress pad in his cell and pressed against the cell door. Officer Sebold entered and pushed McKinney to the back of the cell with his expandable baton. McKinney grabbed Officer Sebold's baton and attempted to wrest it from Officer Sebold's hands. McKinney then became "extremely combative" and "charged towards the [officers]." *Id.* at 240. At that point, Officer D'Aresta deployed Hunter, directing him onto McKinney's lower right leg. Upon being bitten by Hunter, McKinney dropped to the floor, falling partially on top of Officer D'Aresta. As McKinney tussled with the officers, Officer Sebold struck McKinney's leg with his baton, urging McKinney to stop resisting. McKinney continued to fight and struggle with the officers despite the dog bite and baton strikes.

Officer Ward deployed his taser via drive stun to McKinney's left shoulder, ordering that McKinney put out his hands so that he could be handcuffed. McKinney complied following the application of the taser and offered his left hand. The officers rolled McKinney onto his stomach, but he refused to expose his right arm. McKinney then ceased fighting the officers and yelled for the officers to get the canine off of him. Once McKinney was secured in handcuffs, Officer

7

D'Aresta removed Hunter from McKinney's leg. The officers arranged for McKinney to be taken to the hospital for treatment of his injuries.

## II

McKinney filed a lawsuit pursuant to 42 U.S.C. § 1983 against Officers Sebold, Ward, and D'Aresta in the United States District Court for the District of Connecticut, alleging "excessive and unreasonable force in violation of the Fourth Amendment." *Id.* at 13 (capitalization omitted). In addition to his § 1983 claim, McKinney alleged state law claims of intentional, reckless, and negligent assault and battery against the officers as well as statutory and common law negligence against the City of Middletown.

The defendants moved for summary judgment. As to McKinney's § 1983 claim, the police officer defendants argued that the claim "fails as a matter of law as the force used was reasonable and justified under the circumstances presented … [and] the defendants' conduct is protected pursuant to the doctrine of Qualified Immunity." *Id.* at 33. The defendants argued that McKinney's state law claims were precluded by state law defenses and immunity doctrines. Pursuant to the United States District Court for the District of Connecticut Local Rule 56(a)(1), the defendants submitted a statement of undisputed material facts in support of their motion. McKinney filed a responding statement pursuant to Local Rule 56(a)(2).

In his response to the defendants' statement of undisputed material facts, McKinney largely accepted the defendants' account of the encounter except to the extent that the defendants purported to rely on his own deposition testimony in support of their account.

8

McKinney explained that at his deposition, defense counsel asked whether he had "any reason to dispute" certain facts, but because he "was in a state of mental and emotional distress, in a downward spiral, and psychologically decompensating at the time of the incident," he had "very little recollection of the events" and "could not 'dispute'" many of the facts defense counsel asserted. *Id.* at 229. For that reason, McKinney objected to the defendants' citations to his deposition testimony in support of their account of the incident, while nevertheless admitting to many of the facts stipulated by the defendants.

In his Rule 56(a)(2) statement, McKinney stated that he did not dispute the officers' "reported actions or version of the events" and admitted that he engaged in a physical struggle with the officers and physically resisted their attempts to secure him. *Id.* at 244-47. McKinney also broadly accepted the sequence of events as described by the defendants. *See id.* at 230-44. McKinney did, however, dispute the defendants' claim that Officer D'Aresta gave McKinney a warning before deploying Hunter. *Id.* at 238.

The district court granted the defendants' motion for summary judgment. *McKinney v. City of Middletown* (*McKinney I*), No. 3:12-CV-337, 2015 WL 13877588, at *1 (D. Conn. Feb. 11, 2015). Noting that "[t]he facts of this case are largely undisputed," the district court held that "the defendant officers' use of force was reasonable under the circumstances and did not amount to excessive force in violation of the Fourth Amendment." *Id.* at *4. In support of that conclusion, the district court explained that the officers "responded to McKinney's combative behavior and continually warned him to stop resisting," that "[e]ach level of force used was in response to McKinney's resistant behaviors," and that "[t]he defendants provided the plaintiff

with numerous opportunities to comply and allow the defendants to secure him, but he continually refused and threatened them." *Id.* Having concluded that the officers' actions "were reasonable under the circumstances," the district court dismissed McKinney's assault and battery claims. *Id.* at *5. The district court dismissed McKinney's claims against the City of Middletown on the ground that McKinney failed to respond to the arguments the defendants made concerning those claims in the defendants' brief. *Id.* at *3 n.2.

McKinney appealed. This court affirmed in part and vacated in part. *McKinney v. City of Middletown* (*McKinney II*), 712 F. App'x 97 (2d Cir. 2018). We held that "[b]ased on the unique circumstances of this case," summary judgment as to the reasonableness of the officers' use of force was improper because "a reasonable jury could conclude that the combination of baton strikes, the use of a taser, and, especially, the use of a police canine was excessive … notwithstanding McKinney's resistance." *Id.* at 98. We vacated the district court's judgment with respect to McKinney's § 1983 claim and assault and battery claims and remanded those claims to the district court. In so doing, we "express[ed] no view on whether the Officers will ultimately be entitled to qualified or governmental immunity for the claims against them." *Id.* We affirmed the district court's dismissal of McKinney's claims against the City of Middletown in light of McKinney's forfeiture of those claims. *Id.*

On remand, the defendant officers renewed their motion for summary judgment, arguing that they were entitled to judgment as a matter of law under the doctrine of qualified immunity. *McKinney v. City of Middletown* (*McKinney III*), No. 3:12-CV-337, 2019 WL 10255235, at *1 (D. Conn. May 20, 2019). The district court again granted judgment in the defendants' favor, holding that McKinney failed to

establish that the defendant officers violated clearly established law because "the constitutional right at issue—the right to be free from excessive force, by the officers' incremental and combined use of baton strikes, taser, and a canine, when McKinney was combative and actively resisting the officers' attempt to handcuff him to facilitate a transfer from a detention cell to a padded cell, given McKinney's mental state and attempt to harm himself—was not 'clearly established' at the time of the events in question." *Id.* at *11. The district court concluded that "the officers are shielded from liability by qualified immunity" and rendered judgment in the defendant officers' favor. *Id.* Having dismissed McKinney's claim under § 1983, the district court declined to exercise supplemental jurisdiction over McKinney's state law claims. *Id.*

McKinney filed a motion for reconsideration, which the district court denied. *McKinney v. City of Middletown* (*McKinney IV*), No. 3:12-CV-337, 2019 WL 10255237, at *3 (D. Conn. June 19, 2019). McKinney now appeals from the district court's grant of summary judgment to the defendant officers on his claim under § 1983.[2]

## STANDARD OF REVIEW

"We review *de novo* the District Court's grant of summary judgment." *1077 Madison St., LLC v. Daniels*, 954 F.3d 460, 463 (2d Cir. 2020). On review of a summary judgment decision, we must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018).

---

[2] McKinney makes no argument with respect to his state law claims on appeal. We consider those claims to be waived. *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006).

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). No genuine dispute of material fact exists when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant "bears the initial burden of showing that there is no genuine dispute as to a material fact." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). When, as in this case, the burden of proof at trial would fall on the nonmoving party, the moving party "can shift the initial burden by pointing to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Id.* (internal quotation marks and alteration omitted). If the moving party carries its burden, the nonmoving party must "come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

The role of the district court on summary judgment is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). Demonstrating that such issues exist requires the nonmovant to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "The mere existence of a scintilla of evidence in support of the [non-movant's position] will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Thus, rather than merely "deny

the moving party's allegations in a general way," the party opposing summary judgment "must present competent evidence that creates a genuine issue of material fact." *FEC v. Toledano,* 317 F.3d 939, 950 (9th Cir. 2002) (citing *Anderson,* 477 U.S. at 248-52); *see also Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000) ("[U]nsupported allegations do not create a material issue of fact.").

## DISCUSSION

The doctrine of qualified immunity "shields police officers acting in their official capacity from suits for damages unless their actions violate clearly-established rights of which an objectively reasonable official would have known." *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) (alteration omitted). When a defendant moves for summary judgment based on qualified immunity, courts consider "whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct.'" *Travella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). If the constitutional right invoked by the plaintiff was not "clearly established" at the time of the purported violation, qualified immunity precludes civil liability and the defendant is entitled to summary judgment. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("[R]easonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.").

A right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand

13

that what he is doing violates that right." *Travella*, 599 F.3d at 133. This requires that "'controlling authority' or 'a robust consensus of cases of persuasive authority'" have recognized the right at issue. *Liberian Cmty. Assoc. of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011)). Although we do not require a case "directly on point" to hold that a defendant's conduct violated a clearly established right, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

"When a plaintiff alleges excessive force … the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). In analyzing whether this right has been violated, courts must be careful "not to define clearly established law at a high level of generality," *al-Kidd*, 563 U.S. at 742, because "[t]he dispositive question" for the purpose of qualified immunity "is 'whether the violative nature of *particular* conduct is clearly established,'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at 742); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) ("The 'clearly established' standard … requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him."). Qualified immunity would be "no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015). Accordingly, our inquiry focuses on the specific "factual situation the officer[s] confront[ed]," and the defendants will be "entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-53 (2018).

14

We hold that the defendant officers are entitled to qualified immunity under these principles. The undisputed facts of this case establish that McKinney threatened, attacked, and resisted the defendant officers as they tried to subdue him so that he could be transferred to a different cell. The undisputed facts further establish that the officers' incremental and combined uses of a baton, a canine, and a taser were undertaken in response to McKinney's resistance and that once McKinney "finally gave up fighting" and was "handcuffed and secured," the officers withdrew their force. J. App'x 243-44. McKinney has not identified either a "controlling authority … [or] a robust consensus of cases of persuasive authority … clearly establishing the constitutional violation" he alleges, *al-Kidd*, 563 U.S. at 741-42 (internal quotation marks omitted), foreclosing the conclusion that the defendant officers "violate[d] clearly established … constitutional rights of which a reasonable person would have known," *Wilson v. Layne*, 526 U.S. 603, 614 (1999). We conclude that under "the particular facts of [this] case … reasonable officers [could] disagree about the legality of the defendants' conduct," making "summary judgment for the officers … appropriate." *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995). We affirm the judgment of the district court.

## I

McKinney's claim that the defendant officers violated "clearly established … constitutional rights of which a reasonable person would have known" does not withstand scrutiny. *Wilson*, 526 U.S. at 609. With respect to each of his arguments, McKinney either misconstrues the undisputed facts in order to manufacture triable issues or fails to identify a "controlling authority … [or] a robust consensus of cases of persuasive authority … clearly establishing the

15

constitutional violation" he alleges. *al-Kidd*, 563 U.S. at 741-42 (internal quotation marks omitted).

First, McKinney argues that because Officer D'Aresta and Hunter were not trained for "cell extractions," the defendant officers "violated McKinney's clearly established rights by using a canine for a purpose for which it was not trained." Appellant's Br. 22-23 (capitalization omitted). Even if we were to accept the premise that Hunter was used for "cell extraction[]," McKinney has not shown that using a canine for a purpose for which it was not trained violates clearly established law. In support of this proposition, McKinney cites a handful of cases from the Sixth Circuit and one unpublished case from the Middle District of Pennsylvania providing that the use of an *untrained* or *poorly trained* canine can support a Fourth Amendment excessive force claim. *See id.* Such a small set of cases does not amount to "a robust consensus of cases of persuasive authority … clearly establishing the constitutional violation" McKinney alleges, *al-Kidd*, 563 U.S. at 741-42 (internal quotation marks omitted), particularly in light of McKinney's admission that Officer D'Aresta and Hunter "successfully completed the State of Connecticut … training program … and the required state-mandated re-certification training," J. App'x 248. While McKinney argues that "using [a] canine for a purpose outside his training [is] equivalent to using an untrained dog," Appellant's Br. 23, such a proposed extension of precedent is insufficient to overcome qualified immunity, which requires the plaintiff to rely on "existing precedent [that] 'squarely governs' the specific facts at issue," *Kisela*, 138 S. Ct. at 1153.

McKinney's argument fails for the separate and independent reason that the officers did not use Hunter for cell extraction. McKinney admits that Officer D'Aresta did not engage Hunter until

after McKinney "grabbed Officer Sebold's baton and tried to wrestle the baton out of Officer Sebold's hand" and "charged towards the defendants." J. App'x 239-40. McKinney also admits that "[o]nce the plaintiff was handcuffed and secured, Officer D'Aresta broke Hunter off of [his] leg," *id.* at 244, and he does not dispute the officers' reported accounts of the incident, none of which state or imply that Hunter was used to remove McKinney from his cell, *see id.* at 70-76, 244-45. Thus, even if we were to accept McKinney's premise that using a police canine for a purpose for which it has not been specifically trained violates clearly established law, McKinney has "failed to adduce sufficient evidence to warrant a trial" on whether Hunter was used for such a purpose. *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985). Instead, the undisputed facts indicate that Hunter was used to subdue and secure McKinney—a purpose for which Hunter had been trained—and not to remove McKinney from his cell. *See* J. App'x 75, 191, 240, 245. We see no factual or legal basis for McKinney's claim that the defendant officers violated his constitutional rights by using a canine for a purpose for which it had not been trained.

Second, McKinney argues that the defendant officers violated clearly established law by failing to give McKinney a warning before deploying Hunter. We agree with McKinney that there is a genuine dispute of fact as to whether a warning was given, *see* J. App'x 238-39, but this dispute is insufficient to preclude summary judgment. While McKinney cites a number of cases holding that an officer's failure to give a warning before using a police dog on a compliant or non-violent suspect violates clearly established law, none of those authorities are relevant here because McKinney admits that Officer D'Aresta deployed Hunter in the midst of his violent struggle with

17

the police.[3] It may be that an officer violates clearly established law if he fails to give a warning before using a canine on a suspect who is compliant or does not otherwise pose a threat,[4] but "deploying a police dog may be objectively reasonable," even "without a warning," when there is "an immediate threat to the safety of officers and the community." *Moya v. City of Clovis*, No. 18-CV-494, 2019 WL 6255217, at *5 (D.N.M. Nov. 22, 2019), *aff'd*, 829 F. App'x 346 (10th Cir. 2020). McKinney posed such a threat when Officer D'Aresta deployed Hunter because, by his own admission, McKinney "grabbed Officer Sebold's baton and tried to wrestle the baton out of Officer Sebold's

---

[3] *See* J. App'x 239-40; Appellant's Br. 26-27 (citing *Kuha v. City of Minnetonka*, 365 F.3d 590, 596-99 (8th Cir. 2003) (denying qualified immunity where the police used a canine without warning on a plaintiff who alleged that he "held his hands up to surrender as the officers approached"), *abrogated on other grounds by Szabla v. City of Brooklyn Park*, 486 F.3d 385, 391-93 (8th Cir. 2007); *Bey v. Cimarossa*, No. 99-2041, 2000 WL 12830, at *2 (7th Cir. Jan. 3, 2003) (denying qualified immunity where the defendant officer allegedly released a police dog without warning on a plaintiff who "repeatedly averred … in his affidavits and deposition testimony" that he was not "attempt[ing] to evade [or] resist arrest"); *Vathekan v. Prince George's County*, 154 F.3d 173, 176-77 (4th Cir. 1998) (denying qualified immunity where the defendant officer, without giving a warning, released a police dog that then attacked a woman who was sleeping); *Burrows v. City of Tulsa*, No. 93-5087, 1994 WL 232169, at *4 (10th Cir. June 1, 1994) (denying qualified immunity where the plaintiff testified that he was bitten by a police dog without warning while handcuffed); and *Kopf v. Wing*, 942 F.2d 265, 266-69 (4th Cir. 1991) (denying qualified immunity where the police allegedly released a canine without warning on suspects who were hiding from the police)).

[4] *But see Smith v. Potanovic*, No. 02-CV-6240, 2007 WL 1032270, at *2 (S.D.N.Y. Mar. 27, 2007) ("Defendant is entitled to summary judgment on any claim that he failed to warn Plaintiff that the dog would be released: because there is no 'clearly established' right to warnings about the release of dogs, Defendant enjoys qualified immunity for his actions.").

18

hand," became "extremely combative," and "charged towards the defendants" before Hunter was released. J. App'x 239-40. In light of the threat McKinney posed, it would not have been "clear to a reasonable officer" that deploying Hunter without first providing a warning "was unlawful in the situation [the officers] confronted." *Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir. 2003) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). The "generalized constitutional protection" on which McKinney relies, even if accepted, does not apply to "the specific context of [this] case." *Id.* (quoting *Saucier*, 533 U.S. at 201).

Third, McKinney argues that the defendant officers violated clearly established law by allowing Hunter to continue biting him after he ceased actively resisting. "[C]onstru[ing] the facts in the light most favorable to [McKinney] and … resolv[ing] all ambiguities and draw[ing] all reasonable inferences against [the defendants]," as we must on review of the district court's grant of summary judgment to the defendants, *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016), we conclude that a reasonable jury could find that Hunter continued to bite McKinney after McKinney stopped actively resisting the officers. While the defendants assert that McKinney "remained combative and physically resisted the defendants' efforts to secure him *throughout the encounter*," Appellee's Br. 18 (emphasis added), a reasonable jury could find otherwise because McKinney "gave up fighting" and "yelled for the defendants to get the canine off of him" before McKinney was placed in handcuffs and Officer D'Aresta removed Hunter from his leg, J. App'x 243-44.

We nevertheless hold that the defendant officers are entitled to qualified immunity because McKinney has not shown that police officers violate clearly established law by allowing a canine bite to continue until a previously violent suspect can be secured. McKinney

19

argues that "by the time of the confrontation here … manifold cases had held that allowing a dog to continue biting a suspect after he had been subdued violates the Fourth Amendment," Appellant's Br. 28 (emphasis omitted), but the cases McKinney cites do not involve suspects who had just engaged the police in a violent struggle or are otherwise inapposite.[5]

McKinney also attempts to support his claim with the general proposition that the police may not use significant force to overcome a suspect's passive—as opposed to active—resistance. *See Phillips v. Community Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012) (explaining that "willful noncompliance [i]s not the same as active[] resist[ance] but instead [is] passive resistance requiring the minimal use of force")

---

[5] *See* Appellant's Br. 28-31 (citing *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994); *Priester v. City of Riviera Beach*, 208 F.3d 919, 923-24 (11th Cir. 2000); *Griggs v. Wash. Metro. Area Transit Auth.*, 232 F.3d 917, 918 (D.C. Cir. 2000); *Watkins v. City of Oakland*, 145 F.3d 1087, 1090 (9th Cir. 1998); *Lopez v. Hammack*, No. 19-CV-126, 2020 WL 2201899, at *8 (M.D. Ala. May 6, 2020); *Becker v. Elfreich*, 821 F.3d 920, 924 (7th Cir. 2016); *Alicea v. Thomas*, 815 F.3d 283, 286 (7th Cir. 2016); and *Meija v. Gomez*, No. 2:18-CV-1735, 2019 WL 4865016, at *7 (C.D. Cal. Sept. 6, 2019)). McKinney also cites *Meyers v. Baltimore Cty.*, 713 F.3d 723 (4th Cir. 2013), and *Davis v. City of Las Vegas*, 478 F.3d 1048 (9th Cir. 2007), both of which did involve suspects who had physical struggles with the police, but the holdings of those cases are not applicable here. In *Meyers*, the Fourth Circuit affirmed the district court's denial of qualified immunity to a police officer who tased a suspect seven times after he had already been subdued. 713 F.3d at 728-29, 733-34. In *Davis*, the Ninth Circuit reversed the district court's grant of qualified immunity to a police officer who allegedly forced "a handcuffed man into a wall head-first multiple times and then punch[ed] him in the face while he lay face-down on the ground." 478 F.3d at 1057-58. The "specific facts" of this case are not remotely similar to—let alone "squarely govern[ed]" by—*Meyers* or *Davis*. *Kisela*, 138 S. Ct. at 1153.

(internal quotation marks and emphasis omitted); *see also Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (en banc) (noting the distinction between "failure to facilitate an arrest and active resistance to arrest"). McKinney argues that the defendant officers violated clearly established law by failing to restrain Hunter once he stopped fighting with the officers.

But while the police may violate clearly established law by *initiating* significant force against a suspect who is only passively resisting, *see, e.g.*, *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013), McKinney has not shown that it is a violation of clearly established law for the police to ensure that a violent suspect has been secured before *withdrawing* the significant force required to subdue the suspect. In light of the possibility that McKinney would resume his active resistance once force was withdrawn, we cannot say that it was "objectively unreasonable for the officers to believe that their conduct was lawful" under the circumstances. *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994); *see Moya*, 2019 WL 6255217, at *6 ("[I]t is not unreasonable for an officer to delay calling off [a] dog until the officer can confirm that the suspect is fully subdued."); *Johnson v. Scott*, 576 F.3d 658, 659 (7th Cir. 2009) ("Not all surrenders … are genuine, and the police are entitled to err on the side of caution when faced with an uncertain or threatening situation."); *see also Graham v. Connor*, 490 U.S. 386, 396-97 (1989) ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

Fourth, McKinney contends that even if he actively resisted the defendant officers for the entirety of the encounter, "the duration of

21

the dog bite here constitutes excessive force in and of itself." Appellant's Br. 34. McKinney argues that because surveillance footage from the hallway outside of his cell shows that Hunter was inside his cell for two minutes and fifteen seconds, a reasonable jury could conclude that the defendant officers allowed Hunter to bite McKinney for close to the entirety of that time, thereby violating clearly established law. *Id.* at 34-36.

Even affording McKinney the benefit of that assumption, McKinney has not demonstrated that a canine bite lasting for two minutes and fifteen seconds in the face of active resistance violates clearly established law. As McKinney acknowledges, "[t]here is 'no exact duration that is considered reasonable'" in "dog bite cases." Appellant's Br. 34 (quoting *Moya*, 2019 WL 6255217, at *6). Instead, "whether the dog bite begins or continues after the suspect has been subdued" is "[m]ore important than the exact duration" of the bite. *Moya*, 2019 WL 6255217, at *6. McKinney's authorities—none of which are binding on this court—are not to the contrary; these cases show only that some courts have denied qualified immunity when officers subjected compliant, subdued, or nonviolent suspects to dog bites or other significant force for over a minute.[6] Because the cases

---

[6] *See* Appellant's Br. 34-35 (citing *Cooper v. Brown*, 844 F.3d 517, 521 (5th Cir. 2016) (denying qualified immunity where the officer allowed a dog to bite a drunk driving suspect for "one to two minutes"); *Becker*, 821 F.3d at 923 (denying qualified immunity where the plaintiff alleged that "after [he] surrendered," the defendant officer "pulled him down three steps and placed his knee on his back while allowing a police dog to continue to bite him"); *Edwards v. Shanley*, 666 F.3d 1289, 1292 (11th Cir. 2012) (denying qualified immunity to officers who allegedly "allow[ed] a police dog to conduct a five-to-seven-minute attack against a person … lying face down

do not involve suspects who, like McKinney, threatened and assaulted the police and "physically resisted the defendants' attempts to secure him" as the dog bite continued, J. App'x 246, the cases do not resemble the "particular circumstances" of this case, *Wesby*, 138 S. Ct. at 590. Moreover, the cases do not purport to establish that a two-minute dog bite constitutes a *per se* violation of clearly established law. The defendant officers are entitled to qualified immunity even if a reasonable jury could find that Hunter bit McKinney for two minutes and fifteen seconds.

Finally, McKinney argues that the defendant officers violated clearly established law by improperly escalating the use of force, rather than applying force incrementally in response to McKinney's resistance. This argument is foreclosed by McKinney's own admissions as to how the confrontation unfolded. McKinney admits that when Officer Sebold entered his cell, he attempted to steal Officer Sebold's baton and charged toward the defendants, at which point Officer D'Aresta deployed Hunter. J. App'x 239-40. McKinney admits that he "continued to fight and struggle with the defendants" even as Hunter bit his leg and Officer Sebold struck him with his baton. *Id.* at

---

with his hands exposed, no longer resisting arrest, and repeatedly pleading with the officers to call off the dog because he [had] surrender[ed]"); *Bailey v. City of Miami Beach*, 476 F. App'x 193, 195-97 (11th Cir. 2012) (denying qualified immunity to a police dog handler who failed to intervene as officers allegedly beat the plaintiff while he was handcuffed for two to three minutes); *Priester*, 208 F.3d at 923 (denying qualified immunity where the plaintiff alleged that he surrendered but the defendant officer "ordered the dog to attack him anyway"); and *Moore v. Peck*, No. 06-CV-215, 2008 WL 508425, at *1-2, 4 (D. Idaho Feb. 19, 2008) (denying qualified immunity where the defendant officers allegedly allowed a canine to bite the plaintiff, who "did not attempt to physically resist arrest," for two to three minutes)).

240-42. And McKinney further admits that he "finally gave up fighting" only after Officer Ward used his taser on him. *Id.* at 242-43. While McKinney tries to walk back these admissions to create genuine issues of material fact, he may not do so. "Parties are bound by their concessions in Rule 56.1 Statements." *Brown v. N.Y.C. Dep't of Educ.*, 755 F.3d 154, 158 (2d Cir. 2014) (alteration omitted). "If [McKinney] did not agree with these particular factual assertions by [the] Defendants, [he] should not have admitted them. Having responded 'Admitted' to [these] assertion[s], [McKinney] is bound by these admissions." *Opal Fin. Grp., Inc. v. Opalesque, Ltd.*, No. 3:08-CV-1403, 2014 WL 5587004, at *15 (D. Conn. Nov. 3, 2014).

The undisputed facts thus establish that the defendant officers escalated the application of force in order to overcome McKinney's active resistance, precluding any genuine dispute as to whether the officers applied "entirely gratuitous … and therefore excessive [force]" to subdue McKinney. Appellant's Br. 39 (quoting *Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010)).

McKinney has failed to demonstrate that the defendant officers "violate[d] clearly established … constitutional rights of which a reasonable person would have known." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (quoting *Pearson*, 555 U.S. at 231). The defendant officers are entitled to qualified immunity.

## II

McKinney also urges reversal of the district court's judgment on the ground that the district court purportedly failed to apply the proper standard of review at the summary judgment stage. Specifically, McKinney argues that the district court erred by failing to "adopt McKinney's version of events or construe the facts in the

light most favorable to him in analyzing Defendants' claim of qualified immunity." Appellant's Br. 40. This argument has merit in one respect. As McKinney notes, the district court found that he "actively resisted *throughout the encounter*," *McKinney III*, 2019 WL 10255235, at *11 (emphasis added), even though the undisputed facts could support the inference that McKinney's resistance became passive once Officer Ward tased McKinney and McKinney "gave up fighting," J. App'x 243. To the extent that the summary judgment record was ambiguous as to this disputed fact, the district court should not have found that McKinney actively resisted "throughout the encounter." *McKinney III*, 2019 WL 10255235, at *11. Rather, the district court should have "resolve[d] [that] ambiguit[y]" in McKinney's favor and "draw[n] [the] reasonable inference[]" that McKinney's resistance became passive after he was tased. *Walsh*, 828 F.3d at 74; *see* J. App'x 242-44.

That error is not sufficient to warrant reversal because, as we have explained, the defendant officers did not violate clearly established law by continuing to apply significant force to McKinney until he was secured. Because McKinney threatened and assaulted the officers and surrendered only after being subjected to a substantial amount of force, the defendant officers were not necessarily "required … to take [McKinney's] apparent surrender at face value" immediately "after [he] stopped [resisting]." *Johnson*, 576 F.3d at 660. We therefore see no basis for reversing the district court's judgment based on its failure to construe this disputed fact in McKinney's favor.

McKinney purports to identify other errors in the district court's summary judgment analysis, but his arguments fall short. McKinney contends that the district court erred by crediting Officer D'Aresta's "self-serving statement that he warned McKinney to 'stop

25

or you will be bit' before allowing Hunter to maul McKinney." Appellant's Br. 44 (quoting *McKinney III*, 2019 WL 10255235, at \*3). But the district court did not make any such finding; the district court found only that "[t]he officers *state that* D'Aresta warned McKinney to 'stop or you will be bit'" before releasing Hunter. *McKinney III*, 2019 WL 10255235, at \*3 (emphasis added). The district court noted that this fact was disputed. *See id.* at \*3 n.12. Even if the district court had improperly found that a warning was given, we would not reverse its judgment on that ground because, as discussed above, McKinney has not shown that it is a violation of clearly established law for the police to fail to give a warning before releasing a canine in the midst of an ongoing struggle. *See Moya*, 2019 WL 6255217, at \*5.

McKinney additionally contends that the district court erred by finding that the officers' application of force was incremental, but as explained above, McKinney admits that the officers applied increasing force in response to his continuing resistance. In a similar vein, McKinney argues that the district court erred by accepting the defendant officers' version of events and "totally discount[ing] McKinney's," *id.* at 42, yet the district court's account of the incident does not materially differ from McKinney's own admissions, *compare McKinney III*, 2019 WL 10255235, at \*7, *with* J. App'x 238-44.

Indeed, McKinney did not even offer his own version of events for the district court to consider. As McKinney explained in response to the defendants' statement of undisputed material facts, McKinney "was in a state of mental and emotional distress, in a downward spiral, and psychologically decompensating at the time of the incident" and "has very little recollection of the events." J. App'x 239. He "does not dispute" the defendant officers' reported version of events, J. App'x 244-45, but nevertheless insists that there are genuine

26

disputes of material fact that must be decided by a jury. That conclusion cannot be reconciled with our summary judgment jurisprudence, under which "vague denials and memory lapses … do not create genuine issues of material fact." *FDIC v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 205 F.3d 66, 75 (2d Cir. 2000). It is not enough for McKinney to "simply show that there is some metaphysical doubt as to the material facts" by denying the defendants' account of the incident, *Matsushita*, 475 U.S. at 586, which, for the most part, McKinney does not even do. Rather, to overcome summary judgment, McKinney "must come forward with *admissible evidence* sufficient to raise a genuine issue of fact for trial." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (emphasis added). Because McKinney has failed to do so, the defendants are entitled to summary judgment.

## III

McKinney concludes his brief by arguing that we should deny the defendant officers qualified immunity "as a matter of public policy" because the doctrine of qualified immunity has purportedly undermined the deterrent effect of the Fourth Amendment. Appellant's Br. 45 (capitalization omitted). Whatever the merits of McKinney's argument, we cannot deny the defendants qualified immunity based on considerations "of public policy." *Id.* (capitalization omitted). "We are bound to follow the existing precedent of the Supreme Court until that Court tells us otherwise." *N.Y. State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 79 (2d Cir. 2019). We are also "bound by our own precedent 'unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court *en banc*.'" *Nicholas v. Goord*, 430 F.3d 652, 659 (2d Cir. 2005) (quoting *BankBoston, N.A. v. Sokolowski*, 205 F.3d 532, 534-35 (2d Cir.

27

2000)). Neither the Supreme Court nor this court sitting *en banc* has overruled the well-settled principles of qualified immunity we apply in this case. Because the defendants are entitled to qualified immunity under those principles, the judgment of the district court must be affirmed.

## IV

The dissent imagines a scenario in which (1) "the dog bit Mr. McKinney immediately upon entering: that is, before or just as Officer Sebold was pushing Mr. McKinney back," (2) "Mr. McKinney engaged in no more than defensive resistance," and (3) "once on the ground," McKinney "was neither fighting nor actively resisting." *Post* at 5-6. If this is what happened, the dissent suggests, then there would potentially be two violations of clearly established law. By McKinney's own admissions, however, he attempted to grab Officer Sebold's baton out of his hands, became extremely combative, charged toward the defendants *before* Officer D'Aresta deployed Hunter, and continued to fight with the defendants once on the ground. J. App'x 239-41.[7] The dissent would ignore these admissions in order to create disputed issues of fact about the timeline. *Post* at 3. But "[p]arties are bound by their concessions in Rule 56.1 Statements." *Brown*, 755 F.3d at 158 (alteration omitted); *see also Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998) (noting that "[w]e accept as true the material facts contained" in an unopposed Rule 56.1 statement). "Having agreed on a set of facts, the parties, and this Court, must be bound by them; we are not free to pick and choose at will." *Stanley Works v. FTC*, 469 F.2d 498, 506 (2d Cir. 1972). Even if we

---

[7] In his appellate briefing, McKinney "admits that he initially resisted Sebold and attempted to take control of his baton." Appellant's Br. 30.

were to ignore McKinney's admissions, however, summary judgment would still be appropriate because neither McKinney nor the dissent has identified "admissible evidence sufficient to raise a genuine issue of fact for trial." *CILP Assocs.*, 735 F.3d at 123. The dissent offers speculation about what might have occurred inside McKinney's cell, but "unsupported allegations do not create a material issue of fact." *Weinstock*, 224 F.3d at 41.

The dissent goes on to announce that the doctrine of qualified immunity is "misbegotten and misguided" and should be overruled entirely. *Post* at 18. As the dissent agrees, we must apply the applicable precedents regardless of the arguments against maintaining those precedents. *See supra* Part III; *post* at 1. But we do not have as much confidence in those arguments as the dissent evidently does.

First, the dissent asserts that, at the time § 1983 was enacted, the common law did not recognize "anything like qualified immunity," which renders the doctrine an illegitimate judicial invention. *Post* at 20. Some commentators support this view.[8] But other commentators have concluded that historical sources "refute" that position and "confirm[] that the common law around 1871 did recognize a freestanding qualified immunity protecting all government officers' discretionary duties."[9] A survey of state tort cases and tort treatises

---

[8] *See, e.g.*, William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 58-60 (2018).

[9] Scott A. Keller, *Qualified and Absolute Immunity at Common Law*, 73 Stan. L. Rev. 1337, 1344 (2021); *see also* Aaron L. Nielson & Christopher J. Walker, *A Qualified Defense of Qualified Immunity*, 93 Notre Dame L. Rev. 1853, 1864-68 (2018).

from the mid-1800s concludes that "executive officials' discretionary duties entailed a freestanding qualified immunity that plaintiffs could overcome only with clear evidence of subjective improper purpose."[10] We do not enter this debate over official immunities in 1871 except to note that the historical record "should give some pause" to those ready to adopt the dissent's approach without engaging in "additional historical examination and analysis."[11] In our system, "something more than ambiguous historical evidence is required before [the Supreme Court] will flatly overrule a number of major decisions." *Gamble v. United States*, 139 S. Ct. 1960, 1969 (2019) (internal quotation marks omitted). Here, "the history is murky, which, under the law of precedent, counsels in favor of the status quo."[12]

Second, the dissent derides qualified immunity as a "court-made doctrine." *Post* at 24. But the reconsideration even of a court-made doctrine must account for the full extent of judicial intervention. In the case of qualified immunity, that analysis must include the possible court-made expansion of liability under § 1983. Justice Scalia, who also questioned whether qualified immunity was consistent with the common law, recognized this connection:

> [O]ur treatment of qualified immunity under 42 U.S.C. § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted,

---

[10] Keller, *supra* note 9, at 1377. *But see* William Baude, *Is Quasi-Judicial Immunity Qualified Immunity?*, 74 Stan. L. Rev. Online 115 (2022) (responding to Keller).

[11] Nielson & Walker, *supra* note 9, at 1868.

[12] Nielson & Walker, *supra* note 9, at 1864.

and that the statute presumably intended to subsume. That is perhaps just as well. The § 1983 that the Court created in 1961 bears scant resemblance to what Congress enacted almost a century earlier. I refer, of course, to the holding of *Monroe v. Pape*, 365 U.S. 167 (1961), which converted an 1871 statute covering constitutional violations committed "*under color* of any statute, ordinance, regulation, custom, or usage of any State," into a statute covering constitutional violations committed *without* the authority of any statute, ordinance, regulation, custom, or usage of any State, and indeed even constitutional violations committed in stark violation of state civil or criminal law. … *Monroe* changed a statute that had generated only 21 cases in the first 50 years of its existence into one that pours into the federal courts tens of thousands of suits each year, and engages this Court in a losing struggle to prevent the Constitution from degenerating into a general tort law. … Applying normal common-law rules to the statute that *Monroe* created would carry us further and further from what any sane Congress could have enacted.

*Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) (citations omitted). The dissent, in contrast to Justice Scalia, proposes a "one-sided approach to qualified immunity" that "abandons the defense without also reconsidering the source and scope of officers' liability in the first place." *Cole v. Carson*, 935 F.3d 444, 479 (5th Cir. 2019) (Ho & Oldham, JJ., dissenting). We should "not engage in this halfway originalism," in which parties ask "that we apply the Constitution's [or a statute's] supposed original meaning only when it suits them." *Janus v. AFSCME*, 138 S. Ct. 2448, 2470 (2018).

Third, the dissent insists that because "indemnification is the general rule, and officers rarely pay anything," there is no good policy

31

reason for qualified immunity. *Post* at 22. But even assuming that indemnification is as universal as the dissent posits, [13] the pocketbooks of individual officers are not the only interests at stake. The doctrine of qualified immunity "reflects concerns about the states' ability to enforce their laws without undue federal interference." [14] It "acts to safeguard government, and thereby to protect the public at large, not to benefit its agents." *Wyatt v. Cole*, 504 U.S. 158, 168 (1992). "[W]hether a given state official is or is not entitled to such immunity" is "a question whose resolution has profound consequences for the principles of federalism that inform application of the doctrine of qualified immunity." *In re Allen*, 119 F.3d 1129, 1139 (4th Cir. 1997) (Luttig, J., dissenting).

If almost all state officials are indemnified, then altering the doctrine would have significant consequences for state and local governments. "*[E]very* state has adopted and retained individualized statutory indemnification schemes against the uniform backdrop of qualified immunity's existence." [15] In the absence of qualified immunity, "state and local governments operating in competitive employment markets would either pay officers more (to offset the increased risk of judgments) or require officers to do less (to eliminate

---

[13] *But see In re N.Y.C. Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 804 (2d Cir. 2022) ("[I]f the conduct alleged is found to violate 'any rule or regulation' of the NYPD, the City will have grounds to withhold indemnity. As a result, the individual officers have reason to fear financial consequences.") (quoting N.Y. Gen. Mun. L. § 50-k(3)).

[14] Aaron L. Nielson & Christopher J. Walker, *Qualified Immunity and Federalism*, 109 Geo. L.J. 229, 234 (2020).

[15] Nielson & Walker, *supra* note 14, at 265.

the risk). In this way, overruling qualified immunity would not simply affect individual officers; it would affect the states *as states*."[16]

These reliance interests recommend adherence to stare decisis. *Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 202 (1991) ("*Stare decisis* has added force when the [state] legislature, in the public sphere, and citizens, in the private realm, have acted in reliance on a previous decision."). Stare decisis "carries enhanced force" when, as in the case of qualified immunity under § 1983, the relevant precedent "interprets a statute." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015). In such cases, "unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done." *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-73 (1989).[17]

The dissent is unhappy with the state of our law, but "[t]he good news for anyone outraged by this state of affairs is that the American people have a remedy. Congress decides what our laws shall be." *Wearry v. Foster*, 33 F.4th 260, 278-79 (5th Cir. 2022) (Ho, J., dubitante). And that is true of the statute we apply today.

---

[16] *Id.* at 236.

[17] *See also* Amy Coney Barrett, *Statutory Stare Decisis in the Courts of Appeals*, 73 Geo. Wash. L. Rev. 317, 323-24 (2005) ("With respect to statutory errors … , the Court notes that change can come from Congress (and the President) through the normal legislative process. Thus, the Court appears to reason, it should be exceedingly reluctant to revisit statutory precedent.").

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.

GUIDO CALABRESI, *Circuit Judge*, dissenting:

The police arrested a mentally disturbed man who, without his medications, started to behave erratically. Three police officers and a police dog entered his cell, and they may, as the police maintain, have meant to help him. But, in fact, they ended up doing things that a unanimous panel of this court said a jury could find violated this man's constitutional rights. As a result, the man was mangled—truly badly hurt, as the majority must admit. Given that the officers may well have had good intentions, it is not entirely surprising that the majority should stretch to grant them qualified immunity. But if one views the evidence in the light most favorable to the injured man, as we must at this stage, and if one looks at the situation in light of our precedents as well as the holding by our earlier panel, qualified immunity—which should not apply in any case, *see infra*—certainly does not apply in this one. And so, I respectfully dissent.[1]

---

[1] My thinking on this case was much informed by Judge Katzmann's questioning when we heard oral argument. *See* Oral Argument (Apr. 8, 2021) at 5:35–6:07; 25:32–26:08; 26:35-26:42, *McKinney v. City of Middletown*, No. 19-1765, https://www.ca2.uscourts.gov/decisions/isysquery/5cd917c6-b363-4873-87c3-ac022cbde594/1/doc/19-1765.mp3. Of course, I cannot say how Judge Katzmann might have decided this appeal had he lived long enough to remain a member of the panel deciding it, though the decision of the earlier panel, of which he was a member, may offer some indication. So, I write just for myself. As to Judge Katzmann, I can do no more than express my sorrow that we're left only (if one can say *only* of something so precious) with memories and his great contributions to the law.

**I.**

We are reviewing this case on a grant of summary judgment to the officers based on qualified immunity; we are therefore required to apply the familiar summary judgment standards in favor of Mr. McKinney. *See, e.g., Sloley v. VanBramer*, 945 F.3d 30, 36 (2d Cir. 2019) ("[T]he familiar standards that govern resolution of motions for summary judgment apply equally to such motions based on an assertion of qualified immunity[.]"); *see also Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (explaining that a court, in deciding motions for summary judgment based on qualified immunity, "must view the evidence in the light most favorable to the opposing party") (internal quotation marks omitted). In a recent case, Judge Katzmann aptly summarized for our court what this means: "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. . . . In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (Katzmann, J.) (internal quotation marks omitted).

The majority gets this case wrong by resolving ambiguities and drawing inferences against the injured party, Mr. McKinney.[2] It does so first in describing the officers' initial entrance and encounter with Mr. McKinney. On the majority's version of events, Officer Sebold, the first officer to enter the cell, pushed Mr. McKinney back with his baton because there was no other way to enter the cell; in the course of Officer Sebold pushing him back, Mr. McKinney grabbed the baton, attempted to take it from Officer Sebold, and, "extremely combative," somehow also "charged" at the officers. Maj. op. at 7. The majority then asserts that the dog bit Mr. McKinney only after Mr. McKinney charged at the officers and only after the canine officer, Officer D'Aresta, directed the dog to do so. *See id.* Second, according to the majority, even after the officers brought Mr. McKinney to the floor, Mr. McKinney was "fight[ing]" with the officers. *Id.* The biting, beating, and

---

[2] The majority seems to justify this unfavorable version of events because many of the individual propositions it describes as "facts" are included in defendants' Local Rule 56(a)(1) statement and are not specifically denied by Mr. McKinney. *See, e.g.*, maj. op. at 7, 8–9, 18–19. But the defendants' Local Rule statement (1) does not establish a precise timeline of events and (2) does not resolve contradictions in the defendant officers' reports. *See Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) (explaining that it is the province of the jury to decide how chronologically to order details as well as how to reconcile or reject contrary evidence). And so, when the majority establishes a chronology unfavorable to Mr. McKinney and elides contradictions between the officers' reports, it defies the command to resolve ambiguities and draw inferences in favor of the non-moving party. *See Frost*, 980 F.3d at 242.

tasing (by the third officer, Officer Ward), thus, occurred only in response to this fighting. *See id.*; *see also id.* at 8.

Taking the facts as the majority describes them, under the law of this case given our prior panel's holding, the majority must be read to hold that a jury could find that this calibrated escalation of force in response to resistance was unconstitutionally excessive. *See McKinney v. City of Middletown*, 712 F. App'x 97, 98 (2d Cir. 2018) ("Based on the unique circumstances of this case, we think a reasonable jury could conclude that the combination of baton strikes, the use of a taser, and, especially, the use of a police canine was excessive in the context of a confined detention cell, notwithstanding McKinney's resistance."). I can't help but notice that the majority at times seems to doubt that the use of force it describes was *really* unreasonable. *See* maj. op. at 19, 22. And I have my doubts whether the majority would, if it were writing on a blank slate, say there was any constitutional violation on the facts it describes. *See* maj. op. at 15. But the majority can't ignore the prior panel's holding. *See* maj. op. at 10. And so, it would seem, from now on in our circuit, that the use of force described by the majority—a calibrated escalation in response to resistance, in the close confines of a holding cell—is

unconstitutionally excessive. That would be a remarkable holding—and might well, for purposes of qualified immunity, be a new and unexpected one.

Importantly, though, the majority's is not the only version of events a jury could find on this record. In fact, a jury could find that the dog bit Mr. McKinney immediately upon entering: that is, before or just as Officer Sebold was pushing Mr. McKinney back.[3] A jury could find that even before he was brought to the ground Mr. McKinney engaged in no more than defensive resistance, putting his hands up to protect his face from the baton strikes and briefly getting his hands on the baton without taking it away from Officer Sebold.[4] A jury could further find that, once on the ground, at least one of Mr. McKinney's arms was pinned under

---

[3] The dog had been fired up before the officers even cracked the door. Officer D'Aresta entered with the canine at most a second or two after the first officer, Officer Sebold. And the canine lunged into the cell at that very moment. Moreover, according to Officer D'Aresta's report, only "then," after the dog was inside the cell, did he see "Officer Sebold use his baton to drive" Mr. McKinney "back to the rear cell wall." J. App'x 75. Officer D'Aresta additionally said that once the dog entered the cell, the dog was likely to bite anyone it could reach. (Since the cell was no larger than seven by seven with at least a quarter taken up with a concrete bed and the toilet and sink, Mr. McKinney was obviously in immediate reach.)

[4] More specifically, a jury could find that Officer Sebold pushed Mr. McKinney to the back of the cell with his hand while striking him with the baton. The other officers' reports describe "push[ing]" and "us[ing the] baton to drive" Mr. McKinney. J. App'x 71, 75. This statement could be found to mean that Officer Sebold was pushing Mr. McKinney with one hand while, at the same time, striking him with the baton. Significantly, the video suggests Officer Sebold pushed Mr. McKinney back with his hand, and this is consistent with the officer using the baton to strike Mr. McKinney in the head while pushing him. Notably, Officer Sebold admitted he must have struck Mr. McKinney in the head at some point.

him and, at least at that point, he was neither fighting nor actively resisting. And it could find that, while Mr. McKinney's arms were pinned under him, (a) the dog mauled him; (b) Officer Sebold struck him with a baton all over his body; and (c) Officer Ward tased him.[5]

Viewing the evidence in the light most favorable to Mr. McKinney and mindful, as we must be, of the prior panel's holding as to what a jury could find, there are at least two separate clearly established constitutional violations that preclude summary judgment. First, before Mr. McKinney was brought to the ground, the officers' use of the dog on a suspect who was not a threat to others was excessive force. And second, the combined use of force once Mr. McKinney was on the ground was likewise excessive. As to each, the law was clearly established.

## II.

"'A defendant is entitled to qualified immunity only if he can show that, viewing the evidence in the light most favorable to plaintiffs, no reasonable jury

---

[5] The evidence also shows that Mr. McKinney suffered a laceration of the front of his scalp that had to be closed with staples and two large wounds on his lower right leg, one approximately 10 centimeters long and one 12 to 14 centimeters long, both requiring sutures, all as a direct result of the above police actions.

could conclude that the defendant acted unreasonably in light of the clearly established law.'" *Golodner v. Berliner*, 770 F.3d 196, 205 (2d Cir. 2014) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 148 (2d Cir. 2006)). To determine whether a right is clearly established, we "consider Supreme Court decisions and our own decisions, as well as a consensus of cases of persuasive authority," and then judge whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (internal quotation marks omitted); *see also Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (explaining that law is "clearly established if decisions from this or other circuits clearly foreshadow a particular ruling on the issue") (internal quotation marks omitted). The goal is to ensure officers have "fair notice" that their "conduct was unlawful." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *see also Edrei v. Maguire*, 892 F.3d 525, 540 (2d Cir. 2018) (Katzmann, C.J.) (discussing "fair notice requirement").

In this circuit, the use of significant force against a non-threatening arrestee violates clearly established law. At least since 2010, we have recognized that officers may not subject an individual to "a significant degree of force" when that individual does not pose an "immediate threat" to others. *See Tracy v. Freshwater*,

623 F.3d 90, 98 (2d Cir. 2010); *see also, e.g.*, *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123–24 (2d Cir. 2004) (Sotomayor, J.) (discussing *Robison v. Via*, 821 F.2d 913, 923–24 (2d Cir. 1987)).

We have repeatedly stated that our 2010 decision in *Tracy* clearly established this principle for purposes of qualified immunity. Officers may not use a significant degree of force of whatever kind against a non-threatening suspect. *E.g.*, *Muschette ex rel. A.M. v. Gionfriddo*, 910 F.3d 65, 69 (2d Cir. 2018) (citing *Tracy* for proposition that "[i]t is clearly established that officers may not use a taser against a compliant or non-threatening suspect"); *Terebesi*, 764 F.3d at 237 (2d Cir. 2014) ("An officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury.") (internal quotation marks omitted). Furthermore, the precise manner in which the plaintiff was secured or non-threatening—whether lying prone, shackled, or seated in the back of a police car—does not change the analysis. *See Frost*, 980 F.3d at 254–55 (discussing *Rogoz v. City of Hartford*, 796 F.3d 236, 247–48 (2d Cir. 2015) (lying prone); *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (shackled); *Bellows v. Dainack*, 555 F.2d 1105, 1106 & n.1 (2d Cir. 1977) (seated in back of police car)).

\* \* \*

Both the *initial* force that a jury could find to have been used in this case and the force that a jury could find took place *subsequently*, that is, once Mr. McKinney was on the ground, violated this clearly established law.

**III.**

**A.**

The above stated clearly established principle—that it is unconstitutional to use significant force against an arrestee who is not a danger to others—prohibited the use of the dog immediately upon entering Mr. McKinney's cell.

Using a dog to bite and hold is significant force. As the Eleventh Circuit said long ago: "The distinctive aspect of [the bite and hold] training method is its aggressive nature: . . . injury to the apprehended suspect is often inevitable." *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1550 (11th Cir. 1989); *see also, e.g., Becker v. Elfreich*, 821 F.3d 920, 925–26 (7th Cir. 2016) (finding there was factual question as to whether use of dog trained to bite "first thing he comes in contact with" constituted *deadly* force); *Smith v. City of Hemet*, 394 F.3d 689, 701–02 (9th Cir. 2005) (en banc) (noting that use of police service dog is "the most severe force authorized short of deadly force").

The facts of any number of police canine cases make even clearer the grisly force involved. *See, e.g., Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010) (verbally calling off dog from child posed risk that dog "might re-bite [child's] face"); *Kuha v. City of Minnetonka*, 365 F.3d 590, 596 (8th Cir. 2003) (police dog "bite had pierced plaintiff's femoral artery, causing substantial blood loss"), *abrogated in separate part by Szalba v. City of Brooklyn Park*, 486 F.3d 385, 395–96 (8th Cir. 2007) (en banc); *Griggs v. Wash. Metro. Area Transit Auth.*, 232 F.3d 917, 918 (D.C. Cir. 2000) (explaining that dog "inflict[ed] multiple, serious wounds on [plaintiff's] arms, legs, and torso"); *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988) (explaining that because suspect's "arms were not within the dog's reach and, unfortunately, his neck was" and because "dog had been trained to seize whatever part of anatomy was nearest if an arm was unavailable," dog seized suspect's neck and killed him).

It is therefore no surprise that long before the events at issue in this case, multiple circuits agreed that using a dog to bite and hold a suspect who had submitted or who otherwise posed no immediate threat to others constituted excessive force. *See, e.g., Priester v. City of Riviera Beach*, 208 F.3d 919, 923–24 (11th Cir. 2000) (excessive force to sic dog on plaintiff who is lying down); *Watkins v.*

10

*City of Oakland*, 145 F.3d 1087, 1090, 1093 (9th Cir. 1998) (it is clearly established excessive force to allow dog to continue biting suspect until suspect showed his hands after officers arrived at scene); *Kopf v. Wing*, 942 F.2d 265, 268 (4th Cir. 1991) (a jury could find release of police dog unreasonable, "especially where the suspects were cornered and escape impossible"); *see also Campbell v. City of Springboro*, 700 F.3d 779, 789 (6th Cir. 2012) (it was clearly established by 2008 that "allow[ing] a 'bite and hold' dog" to attack suspects who "showed no ability to evade police custody" constituted excessive force).

This consensus "clearly foreshadow[s]" that the rule in *Tracy* applies completely to the significant force of police dogs trained to bite and hold. *See Terebesi*, 764 F.3d at 231. There can therefore be no doubt that the officers had fair notice that using a dog on a non-threatening suspect was excessive force.

And, let me repeat, on the record before us, a jury could find that that's just what they did. The officers, understanding that it was likely to bite anyone it came into contact with, brought the fired-up dog into the cell immediately with them—video shows the dog lunging into the tiny cell at most a second or two after the

11

first officer enters.[6] At that point, let me repeat again, Mr. McKinney was locked alone in a cell in department-issued pajamas; there was no risk that Mr. McKinney might escape or carry out any threats against officers. *See* J. App'x at 257 ("Officer D'Aresta testified that Mr. McKinney could not escape from the cell.").

**B.**

Moreover, as I have explained, a reasonable jury could find that the officers continued to subject Mr. McKinney to tasing, beating, and the dog even after he was on the floor and had ceased any resistance. This too would violate clearly established law.

Our recent opinion in *Jones v. Treubig* explains why. In that case, plaintiff, in the course of an arrest, "tried to turn around and take a swing at" the arresting officer. 963 F.3d at 220 (internal quotation marks omitted). The officer brought plaintiff to the ground and pinned him, though one hand remained uncuffed. *Id.* Plaintiff managed to force himself off the ground, and an officer tased him. *Id.* At this point, officers were not able to grab his hands, and so the officer tased him

---

[6] *Cf. Robinette*, 854 F.2d at 912 (dog trained to seize whatever part of anatomy was nearest if arm was unavailable seized suspect's neck and killed him); *Vathekan v. Prince George's County*, 154 F.3d 173, 178 (4th Cir. 1998) (explaining that once dog was given activating command, it would bite anyone it found, and so attack, if release was unreasonable, would constitute excessive force).

again. *Id.* After that, the officers handcuffed him and took him to the hospital. *Id.* at 220–21. We held that the second tasing violated clearly established law, specifically given our holding in *Tracy*. *Jones*, 963 F.3d at 225–28. As we explained, "even though [plaintiff] may have been resisting arrest during the initial parts of the police encounter up to the time of the first tasing," when defendant initiated the second tasing, plaintiff "was no longer trying to get off the ground, no longer actively resisting arrest, and no longer posing a threat to the police officers." *Id.* at 230; *see also Soto v. Gaudett*, 862 F.3d 148, 158, 159–60 (2d Cir. 2017) (holding it clearly established as of 2008 that use of significant force violated clearly established law where suspect was no longer fleeing but was simply attempting to return to his feet).

The same reasoning applies here. As demonstrated earlier, even if Mr. McKinney was fighting or struggling at some point, a jury could find that once he fell to the ground, he was no longer actively resisting and posed no threat to the safety of the officers or of others. Both the timing and degree of Mr. McKinney's resistance, at least once he was on the ground, are factual questions we can't resolve on this record; they are properly the province of the jury. *See, e.g., Brown v. City of N.Y.*, 798 F.3d 94, 103 (2d Cir. 2015); *McKinney*, 712 F. App'x at 98 (citing

same). Similarly, the timing and degree of force the officers applied relative to that resistance are questions for the jury. *See, e.g.*, *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) (per curiam) (explaining that, for excessive force claims, it is jury's "unique task . . . to determine the amount of force used, the injuries suffered and the objective reasonableness of the officer's conduct"); *McKinney*, 712 F. App'x at 98 (citing same).

A jury could find that the force used was significant and that it continued when Mr. McKinney was "no longer actively resisting arrest, and no longer posing a threat to the police officers." *See also Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018) ("[N]o competent police officer could have failed to comprehend that [the constitutional prohibition against use of excessive force] would encompass repeatedly beating an unresisting, supine . . . suspect[.]").[7] It follows that the officers are not entitled to qualified immunity at this stage.

---

[7]    The majority makes two further arguments that can be dealt with summarily.

It contends that having a dog continue to bite a previously resisting suspect is a novel use of force in novel circumstances such that the officers are entitled to qualified immunity. Maj. op. at 20–21 & n.5. It is of course true that excessive force cases with dogs usually involve flight and pursuit, but that's because it is extremely unusual to use dogs, trained to bite and hold, in close quarters. And as the consensus of other circuits makes perfectly clear, using a dog in such close quarters where there is no possibility of escape is bound to be unreasonable. That will be so even if there was prior resistance. That is because, as we reemphasized in *Jones*, even when arrestees

**IV.**

In the case before us, it is not for us to determine whether a jury could find the officers' conduct unreasonable. The previous panel decided it could.

And it is perfectly clear that at least two instances of unreasonable force that a jury could, on this record, find had been used would violate clearly established law. If the officers had the dog bite Mr. McKinney before or just as Officer Sebold was pushing him back and striking him, when Mr. McKinney was at most engaged in passive or defensive resistance, that use of significant force would violate clearly established law. If, once he was on the ground, Mr. McKinney was not actively

---

have engaged police in a violent struggle, that does not license indefinite use of significant force. In any event, in the current case, a jury could find that Mr. McKinney did not in fact engage in anything more than defensive or passive resistance.

The majority also relatedly makes the peculiar suggestion that "*initiating* significant force against a suspect who is only passively resisting" violates clearly established law but that continuing to apply significant force against a suspect who is only passively resisting but not handcuffed does not. Maj. op. at 21–22 (emphasis in original). But this "distinction" finds no place in precedent. *E.g.*, *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 (2021) (rejecting per se rule that continuing prone restraint is objectively reasonable, without regard to duration, so long as plaintiff resists directives and efforts to subdue him); *Timpa v. Dillard*, 20 F.4th 1020, 1034 (5th Cir. 2021) ("[I]f enough time elapsed between the [subject's active resistance] and the use of force that a reasonable officer would have realized [the subject] was no longer resisting, the further use of force is unnecessary and objectively unreasonable.") (internal quotation marks omitted and second two alterations in original); *Waterman v. Batton*, 393 F.3d 471, 481–82 (4th Cir. 2005) (holding that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated" and collecting cases for same). The question before us is simply whether a jury could find the plaintiff was no longer resisting. *See Jones*, 963 F.3d at 230–35.

15

resisting when the officers, having tased him, continued to beat him and have the dog chew on his leg, the officers would not be entitled to qualified immunity for that use of significant force.

Of course, if this case came before a jury, that jury might find that it wasn't "objectively unreasonable" for the officers to act as they did. *See* maj. op. at 22; *see generally Edrei*, 892 F.3d at 544 (Katzmann, C.J.) (discussing "various factual showings that would change the [reasonableness] calculus"). That would certainly not be an impossible finding. But on this record, at summary judgment, and given the law of this case, we cannot say that now.

Accordingly, I respectfully dissent.[8]

---

[8]    In its answer to my dissent, the majority asserts that Mr. McKinney conceded facts, which, if taken as true, would make reasonable officers think they were not doing wrong, and therefore that qualified immunity should apply. The majority writes that we must take these asserted concessions as facts and that that settles the matter. There are two problems with this approach. First, the alleged concessions are not really concessions; they are statements indicating that someone with mental-health difficulties could not remember the events and, thus, could not dispute what the officers assert as fact. That is not a concession of the sort the majority would like it to be. The second problem is that, even if this were a concession, the cases the majority cites do not at all suggest that where a concession has been made, it is impossible for an issue of fact to arise. Maj. op. at 31 (citing *Brown v. N.Y.C. Dep't of Educ.*, 755 F.3d 154, 158 (2d Cir. 2014) and *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). These cases do not consider whether, where there is evidence in the record, aside from a nonmoving party's testimonial evidence, that conflicts with that nonmoving party's Local Rule 56.1 statement, that this evidence can create a material issue of fact.

It is very different when, as here, there is what appears to be a concession, but also descriptions of the facts made by other parties or a video that contradict the concession. In such a situation, an issue of fact may arise. *Cf. Holtz v. Rockefeller*, 258 F.3d 62, 74 (2d Cir. 2001) (declining to deem as admitted the uncontested assertions of the moving party because though "the purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records," it is "not a vehicle for making factual assertions" unsupported by the record as a whole).

In the instant case, Mr. McKinney's failure to dispute what he did not remember is countered by statements made by the officers. It is these statements that create a factual dispute about whether what the officers did violated Mr. McKinney's rights and hence also about whether these officers were entitled to qualified immunity. Our previous panel, in finding that a jury could find a violation of rights, must have found that issues of fact existed despite Mr. McKinney's asserted concession. In its answer to my dissent, as in its opinion in chief, the majority ignores what was the governing thrust of our previous panel's opinion.

**Appendix**

I dissent in this case because, as a prior panel held, a jury could find that the officers' use of force was excessive and because at least two such possible uses of excessive force violated clearly established law. But I would be remiss in not adding briefly why we should not be here at all, why the doctrine of qualified immunity—misbegotten and misguided—should go.[9]

As scholars have made clear, and more and more judges have come to recognize, qualified immunity cannot withstand scrutiny. *See, e.g.*, *Baxter v. Bracey*, 140 S. Ct. 1862, 1862–64 (2020) (Thomas, J., dissenting from the denial of certiorari); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1869–72 (2017) (Thomas, J., concurring in part and concurring in the judgment); *Wyatt v. Cole*, 504 U.S. 158, 170–74 (1992) (Kennedy, J., joined by Scalia, J., concurring); *Wearry v. Foster*, 33 F.4th 260, 278–79 (5th Cir. 2022) (Ho, J., dubitante); *Jefferson v. Lias*, 21 F.4th 74, 87, 93–94 (3d Cir. 2021) (McKee, J., joined by Restrepo & Fuentes, JJ., concurring); *Goffin v. Ashcraft*, 977

---

[9] In its answer to my dissent, the majority takes issue with what I say about qualified immunity. That is certainly its right. Qualified immunity is the law and, unless and until the Supreme Court, Congress, or both alter that doctrine, I am bound by it. Therefore, in this appendix to my dissent I do what the majority suggests should be done and appeal to Congress. But I also appeal to the Supreme Court. Qualified immunity being a court-made doctrine, such an appeal is clearly proper as well. *Stare decisis* has its weight, but the Supreme Court is quite capable of overturning its past holdings when it has been convinced that they are wrong.

F.3d 687, 694 n.5 (8th Cir. 2020) (Smith, C.J., concurring); *Sampson v. County of Los Angeles*, 974 F.3d 1012, 1025 (9th Cir. 2020) (Hurwitz, J., concurring in part and dissenting in part); *Cox v. Wilson*, 971 F.3d 1159, 1165 (10th Cir. 2020) (Lucero, J., joined by Phillips, J., dissenting from the denial of rehearing en banc); *McCoy v. Alamu*, 950 F.3d 226, 237 (5th Cir. 2020) (Costa, J., dissenting in part); *Reich v. City of Elizabethtown*, 945 F.3d 968, 989 n.1 (6th Cir. 2019) (Nelson Moore, J., dissenting); *Zadeh v. Robinson*, 928 F.3d 457, 478–81 (5th Cir. 2019) (Willett, J., concurring in part and dissenting in part); *Dew v. City of Seaside*, No. 19-6009, 2021 WL 1749898, at *7 (N.D. Cal. May 4, 2021) (Gilliam, J.); *Briscoe v. City of Seattle*, 483 F. Supp. 3d 999, 1008 (W.D. Wash. 2020) (Zilly, J.); *Jamison v. McClendon*, 476 F. Supp. 3d 386, 403–09 (S.D. Miss. 2020) (Reeves, J.); *Lee v. Univ. of N.M.*, 449 F. Supp. 3d 1071, 1114–19 & nn. 13–15 (D.N.M. 2020) (Browning, J.); *Fijalkowski v. Wheeler*, 361 F. Supp. 3d 577, 584–86 & nn.5–6 (E.D. Va. 2019) (Ellis, J.); *Thompson v. Clark*, No. 14-7349, 2018 WL 3128975, at *6–13 (E.D.N.Y. June 26, 2018) (Weinstein, J.); William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 55–61 (2018); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1799–1814 (2018); *Examining Civil Rights Litigation Reform, Part 1: Qualified Immunity: Hearing Before the Subcomm. on Const., Civ. Rts., and Civ. Liberties of the H. Comm. On*

*the Judiciary*, 117th Cong. (2022) (statement of Hon. Jon O. Newman, Senior Circuit Judge, U.S. Court of Appeals for the Second Circuit), https://docs.house.gov/meetings/JU/JU10/20220331/114567/HHRG-117-JU10-Wstate-NewmanJ-20220331.pdf.

The Supreme Court has offered two sets of justifications for adhering to qualified immunity: the first is wrong, and the second, to the extent it addresses a real problem, supports the wrong solution.

First, the Court has sometimes grounded qualified immunity in what they said was the common law background to the statute imposing liability on state actors. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993); *Malley v. Briggs*, 475 U.S. 335, 342 (1986) (explaining that courts are constrained in finding immunities to section 1983 liability by "the intent of Congress in enacting § 1983" and that courts "are guided in interpreting Congress' intent by the common-law tradition").

But scholars have demonstrated that there was no common law background that provided a generalized immunity that was anything like qualified immunity. *See* Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. at 55–61; Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. at 1802; *see also* William Baude, *Is Quasi-Judicial Immunity Qualified Immunity?*, 74 Stan. L. Rev. Online 115,

124–25 (2022) (discussing Scott A. Keller, *Qualified and Absolute Immunity at Common Law*, 73 Stan. L. Rev. 1337 (2021)); *see also* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101, 165–87 (forthcoming).

Second, the Court has turned more and more to justifying qualified immunity as good policy, even if Congress didn't enact it. In particular, the Court has argued that qualified immunity strikes a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982); *see also Anderson v. Creighton*, 483 U.S. 635, 645, 646 (1987) (Scalia, J.) (rejecting suggestion that "precise contours of official immunity can and should be slavishly derived from the often arcane rules of the common law").

But there is every reason to doubt that the Court's created immunity from suit strikes the right balance. *See* Fowler V. Harper, Fleming James, Jr., & Oscar S. Gray, The Law of Torts, § 29.10 (1986); *see also* Jon O. Newman, *Suing the Lawbreakers: Proposals to Strengthen the Section 1983 Damage Remedy for Law Enforcers' Misconduct*, 87 Yale L.J. 447, 447–48, 462, 465 (1978).

Much of the defense of qualified immunity focuses on the harm liability would do to individual officers. *E.g.*, *Harlow*, 457 U.S. at 818; *see also Pierson v. Ray*, 386 U.S. 547, 555 (1967). But, in fact, qualified immunity is largely irrelevant to officers' individual financial liability. In general, individual officers do not pay for their defense or damages if a judgment is entered against them: indemnification is the general rule, and officers rarely pay anything. *See* Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. Rev. 885, 912–37 (2014); *see also* James E. Pfander et al., *The Myth of Personal Liability: Who Pays When* Bivens *Claims Succeed*, 72 Stan. L. Rev. 561, 579–96 (2020); Margo Schlanger, *Inmate Litigation*, 116 Harv. L. Rev. 1555, 1675–76 (2003); *see also Richardson v. McKnight*, 521 U.S. 399, 411 (1997).

Moreover, as to any possible concerns about officer distraction due to the possibility of liability, there is a long-recognized better solution: formally make the employer the defendant and the *only* one who pays. Employer liability is the rule in most every other area of tort law, and it makes good sense. *See, e.g.*, Gary T. Schwartz, *The Hidden and Fundamental Issue of Employer Vicarious Liability*, 69 S. Cal. L. Rev. 1739, 1740–41 (1996); Alan O. Sykes, *The Economics of Vicarious Liability*, 93 Yale L.J. 1231, 1236–39, 1245–56 (1984). And *sole* employer liability is the rule as to federal employees acting in the scope of employment. *See* 28 U.S.C. §§ 1346(b)(1),

2679(b)(1). And that also makes good sense: the employer is better positioned to prevent future misconduct and mistakes and to ensure violations of constitutional rights do not go uncompensated. *See* Kimberly Kindy, *Insurers Force Change on Police Departments Long Resistant to It*, Wash. Post (Sept. 14, 2022), https://www.washingtonpost.com/investigations/interactive/2022/police-misconduct-insurance-settlements-reform (describing how insurance companies are leading to better police practices through pressures on municipalities); *see also*, Harper, James, and Gray, The Law of Torts, § 29.15A; S. Rep. No. 93-588 (1973), *as reprinted in* 1974 U.S.C.C.A.N. 2789, 2790–91 (discussing need for government liability for intentional torts by federal law enforcement officers to ensure recovery). With the employer as the only defendant, there is absolutely no reason to make anything like qualified immunity an impediment to claims. *See Owen v. City of Independence*, 445 U.S. 622, 650–51 (1980).

Once that is done, we can engage in a serious discussion of when it is appropriate for defendant payment and victim compensation to occur. The standards for liability and compensation need not be the same as those that govern master-servant liability in ordinary tort law. But, in any case, the discussion should

center on the real issue, on when we want a city or state to pay an injured victim, and not on the false issue of when officer liability is appropriate.

The Supreme Court should do away with this ill-founded, court-made doctrine, and *Congress* should take up the important challenge of ensuring effective law enforcement, deterring misconduct, and providing for those injured while giving municipalities and states protections that might be appropriate. *See generally* Robert A. Katzmann, Courts and Congress 112 (1997) ("The constitutional Framers intended that the branches of government, each with differing perspectives, would through 'separateness but interdependence' contribute to sound decisions. For the judiciary and Congress, this means a shared appreciation of each other's obligations[.]") (footnotes omitted).